## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, Individually and on Behalf of All Others Similarly Situated,<br><br>                                    Plaintiffs,<br><br>        v.<br><br>DEUTSCHE BANK AKTIENGESELLSCHAFT (F/K/A DEUTSCHE BANK AG); DEUTSCHE BANK SECURITIES INC.; CITIGROUP GLOBAL MARKETS LIMITED; CITIGROUP GLOBAL MARKETS INC.; RBC EUROPE LIMITED; RBC CAPITAL MARKETS LLC; HSBC BANK PLC; HSBC SECURITIES (USA) INC.; MORGAN STANLEY & CO. INTERNATIONAL PLC; and MORGAN STANLEY & CO. LLC,<br>                                    Defendants. | Case No. 1:23-cv-05095<br><br>**JURY TRIAL DEMANDED**<br><br><u>**CLASS ACTION COMPLAINT**</u> |

Plaintiff Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters" or "Plaintiff"), on behalf of itself and all others similarly situated, files this Complaint against Defendants Deutsche Bank Aktiengesellschaft (f/k/a Deutsche Bank AG) ("DBAG") and Deutsche Bank Securities Inc. ("DBSI") (together, the "Deutsche Bank" Defendants); Citigroup Global Markets Limited and Citigroup Global Markets Inc. (together, the "Citigroup" Defendants); RBC Europe Limited and RBC Capital Markets LLC (together, the "RBC" Defendants); HSBC Bank plc and HSBC Securities (USA) Inc. (together the "HSBC" Defendants), and Morgan Stanley & Co International Plc and Morgan Stanley & Co. LLC (together, the "Morgan Stanley" Defendants) (collectively, "Defendants"). Plaintiff's allegations are made on personal knowledge as to Plaintiff and Plaintiff's own acts and upon information and belief as to all other matters.

## NATURE OF THE ACTION

1.      Plaintiff's claim arises from Defendants' anticompetitive scheme to fix, raise, maintain, stabilize, or otherwise manipulate the price of British pound sterling-denominated United Kingdom ("UK") government bonds ("Gilt Bonds" or "Gilts") sold and purchased throughout the United States from at least as early as January 1, 2009 through at least December 31, 2013 (the "Class Period").

2.      Gilt Bonds are sovereign debt packaged and issued by the UK government to raise money for financing government programs, paying down old debt, paying interest on current debt, and any other UK government spending needs.  Major purchasers and holders of Gilt Bonds include US institutional investors, mutual funds, hedge funds, pension funds, and insurance companies.

3.      Gilt Bonds are issued in the primary market at auction to Defendants (among a select group of "primary dealer" banks), and Defendants subsequently trade them in the secondary market.  In a competitive secondary market, dealers would compete for customers based on, among other things, the prices they quote for the purchase and sale of Gilt Bonds.  The smaller the "spread" (difference) between the "bid" (buy) and "ask" (sell) quoted to the customer, the better and more competitive the prices are for customers.

4.      Defendants, however, agreed to fix the bid-ask spreads of Gilt Bonds in the secondary market.  No dealer could widen its bid-ask prices unilaterally without losing trading business to its competitors.

5.      Defendants' traders orchestrated and maintained their conspiracy via regular electronic communications through private online chatroom communications.  Through such communications, these traders colluded to manipulate the allocations and prices of Gilt Bonds in the primary and secondary markets.

6.      In furseture of the scheme, Defendants and their co-conspirators secretly exchanged commercially and competitively sensitive information, including the prices they offered to customers, and trading strategies.[1]  This conduct benefitted the Defendants, to the detriment of investors in the market, including Plaintiff and the Class.

7.      On May 24, 2023, the UK Competition and Markets Authority ("CMA") publicly announced that it issued a Statement of Objections to the five Defendant bank families, which "each unlawfully shared competitively sensitive information by participating in one or more series of one-to-one conversations . . . between 2009 and 2013 . . . related to the buying and selling of UK government bonds – specifically, gilts and gilt asset swaps."[2]  A Statement of Objections reflects the CMA's preliminary view that Defendants violated UK competition law.[3]  If the violation is confirmed, the CMA can levy substantial fines.

8.      The announcement describing the CMA's Statement of Objections states that "Deutsche Bank alerted the CMA to its participation in the alleged unlawful behaviour under the CMA's leniency policy, and Citi applied for leniency during the CMA's investigation."[4] According to a Deutsche Bank spokesperson, the bank was able to secure "'provisional immunity'" for revealing the misconduct.[5]  In order to qualify for immunity or leniency from or agree to a settlement with the CMA under its leniency policy, banks must admit their participation

---

[1]      *See* Press Release, Competition and Markets Authority, *CMA provisionally finds 5 banks broke competition law on UK bonds* (May 24. 2023), https://www.gov.uk/government/news/cma-provisionally-finds-5-banks-broke-competition-law-on-uk-bonds.

[2]      *Id.*

[3]      *See* Competition and Markets Authority*, UK government bonds: suspected anti-competitive arrangements* (May 24, 2023), https://www.gov.uk/cma-cases/financial-services-sector-suspected-anti-competitive-practices.

[4]      *Id.*

[5]      Sinead Cruise & Amy-Jo Crowley, *Deutsche, Citi admit anti-competitive bond market activity in UK probe*, REUTERS  (May  24,  2023)  https://www.reuters.com/business/finance/hsbc-citi-deutsche-bank-morgan-stanley-rbc-traders-broke-competition-law-2023-05-24/.

in anti-competitive conduct.[6]  Indeed, the CMA confirmed that "[b]oth banks have admitted their involvement in anti-competitive activity."[7]

9.     Defendants' conduct injured investors in Gilt Bonds.  Defendants and their co-conspirators have inflated the prices at which they sold Gilt Bonds to investors and reduced the prices at which they purchased these products from investors, including Plaintiff and members of the Class (defined below).  Thousands of investors have transacted billions of dollars' worth of Gilt Bonds in the United States directly with Defendants and their co-conspirators.  Plaintiff, on behalf of itself and all others similarly situated, seeks damages as a result of the unlawful conduct, trebled as provided by law.

## JURISDICTION AND VENUE

10.     This Court has subject-matter jurisdiction under §§4 and 16 of the Clayton Act (15 U.S.C. §§15(a) and 26).  This Court also has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1337(a).

11.     Venue is proper in this District pursuant to 15 U.S.C. §§15(a) and 22, and 28 U.S.C. §1391(b), (c), (d) because during the Class Period all Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

---

[6]      *See Guidance on the CMA's investigation procedures in Competition Act 1998 cases: CMA8*, COMPETITION & MARKET AUTHORITY (Jan. 31, 2022), https://www.gov.uk/government/publications/guidance-on-the-cmas-investigation-procedures-in-competition-act-1998-cases/guidance-on-the-cmas-investigation-procedures-in-competition-act-1998-cases#fn:8.

[7]      *See supra*, n.3.

12.    Each Defendant conducts business in this District itself or through its subsidiaries and affiliates as agents, as well as through branch offices and trading hubs located in this District, as described below.

13.    This Court has personal jurisdiction over each Defendant because, as described below, these Defendants played an integral role in conducting substantial Gilt Bonds promotion, marketing, trading, and sales in this District and in the United States continuously throughout the Class Period and derived substantial profits from these activities.

14.    As alleged below, a substantial part of the events giving rise to Plaintiff's claim occurred in this District and the United States.  Defendants and their co-conspirators agreed to fix the prices of Gilt Bonds that Defendants distributed into the United States for sale to investors located in this District and throughout the United States.

15.    Defendants, both on their own and acting through their subsidiaries and affiliated entities as agents, purposefully availed themselves of this forum by, *inter alia*: (a) directing Gilt Bonds sales and trading personnel to solicit investors for billions of dollars' worth of price-fixed Gilt Bonds transactions in this District and throughout the United States; and (b) collecting unlawful overcharges from investors in this District and throughout the United States.

16.    During the Class Period, the Gilt-edged Market Makers ("GEMMs") were the banks sanctioned by the UK government as Gilt Bond primary dealers able to purchase Gilt Bonds directly from the UK government at auction.  As of 2013, 21 banks, including banks from all five Defendant families, were operating as GEMMs.

17.    Most entities that were designated as GEMMs were part of the global bank's fixed income trading and sales network.  These networks include fixed-income sales employees who manage relationships with customers and provide market information and trade recommendations,

as well as traders who determine prices quoted to investors for specific categories of fixed-income products. Large global banks also employ staff members responsible for ensuring that: (a) the banks meet regulatory requirements so that they can execute fixed-income transactions with customers located in different jurisdictions; and (b) these transactions are accompanied by the appropriate trade documentation. Banks use these networks to trade Gilt Bonds with investors in major financial markets, including New York.

18.     Defendants Deutsche Bank Aktiengesellschaft, Citigroup Global Markets Limited, HSBC Bank Plc, RBC Europe Limited, and Morgan Stanley & Co. International Plc (collectively, the "Primary Dealer Defendants") were designated Gilt Bond primary dealers during the Class Period. Traders employed by the Primary Dealer Defendants were responsible for determining prices quoted to investors for Gilt Bonds, including hundreds of millions, if not billions, of dollars' worth of transactions that these entities executed directly with investors in the United States.

19.     The Primary Dealer Defendants purposefully exploited the US market for Gilt Bonds in at least five ways. **First**, when a salesperson employed by a Defendant or affiliated entity received an order from a customer to purchase or sell a Gilt Bond, the salesperson requested a price quote from a Primary Dealer Defendant's trader. When traders made pricing decisions, they knew the identity and location of the customer requesting a quote. Thus, when the Primary Dealer Defendants' traders quoted fixed prices for Gilt Bonds to investors in the US market as more particularly alleged below, they intentionally restrained competition in the US market for Gilt Bonds.

20.     **Second**, each Primary Dealer Defendant purposefully availed itself of the US market for Gilt Bonds by sending trade recommendations, trade ideas, targeted price levels at which to execute trades, research, and information about the Primary Dealer Defendant's inventory

to sales personnel assigned to cover the US market.  Because these same traders were simultaneously carrying out a conspiracy to fix the prices of Gilt Bonds, these acts constituted purposeful availment of the US market.

21.     *Third*, each Primary Dealer Defendant acquired Gilt Bonds in the primary market, colluded on the prices at which these bonds were sold to Plaintiff and the Class in the secondary market, and distributed these bonds into the United States.

22.     *Fourth*, each Primary Dealer Defendant collected funds, including overcharges from their price-fixing conspiracy, from customer accounts located in the United States.

23.     *Fifth*, each Primary Dealer Defendant charged fixed prices in the US market to investors located here.  By quoting fixed prices in the US market and collecting the resulting overcharges from investors located here, each Primary Dealer Defendant purposefully availed itself of the US market for Gilt Bonds.

24.     The Primary Dealer Defendants, either themselves or through an affiliated entity that was part of the banks' fixed-income trading and sales network, had substantial fixed-income trading and sales operations in this District.  From these desks, Defendants' banks promoted, marketed, and sold Gilt Bonds to investors located in this District and throughout the United States.

25.     Figure 1 below shows that Defendants had US-based dealer affiliates headquartered in this District that helped to promote, market, and sell sovereign bonds, including Gilt Bonds, to investors located in this District and throughout the United States.

**Figure 1 – Headquarters of GEMM Primary Dealers'
US-Based Dealer Affiliates**

| GEMM Primary Dealer Defendants | US Dealer Affiliate Defendants and Their Headquarters |
|---|---|
| Deutsche Bank Aktiengesellschaft | Deutsche Bank Securities Inc. New York, NY |
| Citigroup Global Markets Limited | Citigroup Global Markets Inc. New York, NY |
| RBC Europe Limited | RBC Capital Markets, LLC New York, NY |
| HSBC Bank Plc | HSBC Securities (USA) Inc. New York, NY |
| Morgan Stanley & Co. International Plc | Morgan Stanley & Co. LLC New York, NY |

26.     Defendants also focused on customers in critical geographic markets by designating certain geographic locations in which they maintained significant fixed income trading and sales operations as hubs.  As shown in Figure 2, Defendants designated the New York metropolitan area as a US hub for their global fixed income trading and sales operations.

**Figure 2 – Locations of GEMM Primary Dealers' Fixed Income Trading Hubs**

| GEMM Primary Dealer Defendants | Fixed Income Trading and Sales Hubs |
|---|---|
| Deutsche Bank Aktiengesellschaft | **New York**, London, Frankfurt, Sao Paulo, Dubai, Singapore, Hong Kong |
| Citigroup Global Markets Limited | **New York**, London, Zurich, Hong Kong, Singapore |
| RBC Europe Limited | **New York**, London, Toronto, Sydney, Tokyo |

| GEMM Primary Dealer Defendants | Fixed Income Trading and Sales Hubs |
|---|---|
| HSBC Bank Plc | **New York**, London, Hong Kong, Singapore, Tokyo, Sydney |
| Morgan Stanley & Co. International Plc | **New York**, London, Hong Kong, Tokyo, Singapore |

27.    Accordingly, Defendants' activities were within the flow of, were intended to, and did have a substantial effect on the interstate and foreign commerce of the United States.

## THE PARTIES

### *Plaintiff*

28.    Plaintiff Oklahoma Firefighters was established in 1980 to provide retirement and other specified benefits to qualified firefighters and their beneficiaries.  It is headquartered in Oklahoma City, Oklahoma.  Oklahoma Firefighters transacted Gilt Bonds with one or more members of the Gilt Bond cartel, including Defendant HSBC Bank plc, HSBC Securities (USA) Inc., and Citigroup Global Markets Inc.  As a direct and proximate result of Defendants' collusive activities, Oklahoma Firefighters was injured in its business or property.

### *Defendants*

**The Deutsche Bank Defendants**

29.    Defendant Deutsche Bank Aktiengesellschaft ("DBAG") is a German public limited company with its principal place of business located at Taunusanlage 12, 60325 Frankfurt am Main, Germany.

30.    Deutsche Bank Group organizes its activities on a "business segment" basis.  Its fixed income sales and trading operations, including its Gilt Bond sales and trading operations, are organized under its "Corporate Banking & Securities" business segment.

31.     Employees within the Corporate Banking & Securities business segment market price and sell fixed income products, including Gilt Bonds, to clients such as large global corporations, financial institutions, and US-based businesses.

32.     During the Class Period, DBAG served as a Gilt Bonds primary dealer. DBAG's traders located in its London branch were responsible for determining Gilt Bond prices charged to investors located in the United States.

33.     DBAG operates a US branch, licensed by the New York State Department of Financial Services, at 1 Columbus Circle New York, New York 10019.

34.     Defendant DBAG is the parent entity of DBSI, a Delaware corporation with its principal place of business located at 1 Columbus Circle, New York, New York 10019.

35.     DBSI is Deutsche Bank Group's US broker-dealer, registered with the US Securities and Exchange Commission ("SEC") and the Financial Industry Regulatory Authority.

36.     During the Class Period, DBSI sold Gilt Bonds directly to investors in the United States and distributed Gilt Bonds into the United States.  Therefore, both DBAG and DBSI actively cultivated the US market for Gilt Bonds during the Class Period.

37.     Because DBAG conducts substantial business in the United States on its own and through its subsidiaries, it is required under the Dodd-Frank Act to submit triennial Resolution Plans to the Federal Reserve Board.

38.     According to DBAG's SEC Form 20-F filing, "[Deutsche Bank's] operations are subject to extensive federal and state banking, securities and derivatives regulation and supervision in the United States. . . .  [It] also control[s] US banking organization subsidiaries, including . . . Deutsche Bank Trust Company Americas ("DBTCA"), and US broker-dealers, such as Deutsche Bank Securities Inc. . . . [Deutsche Bank's] principal US SEC-registered broker-dealer subsidiary,

Deutsche Bank Securities Inc., is a member of the New York Stock Exchange . . ." and other securities exchanges.[8]

39.     DBAG referred to itself as "Deutsche Bank AG and its subsidiaries Deutsche Bank Securities Inc. ('DBSI')" in discussions resolving investigation by the SEC and the Commodities Futures Trading Commission.

40.     DBAG's operations in the United States led to significant sales of Gilt Bonds to customers in the United States.

41.     Accordingly, throughout the Class Period, the Deutsche Bank Defendants purposefully availed themselves of the US market for Gilt Bonds.

**The Citigroup Defendants**

42.     Defendant Citigroup Global Markets Limited is a UK private limited company with its principal place of business at Citigroup Centre, Canada Square, Canary Wharf, London, E14 5LB, United Kingdom.  Citigroup Global Markets Limited is a wholly-owned broker-dealer subsidiary of Citigroup Inc., a Delaware corporation with its principal place of business at 388 Greenwich Street, New York, New York, 10013.  During the Class Period, Citigroup Global Markets Limited served as a Gilt Bond primary dealer.

43.     Citigroup Global Markets Limited actively cultivated the US market for Gilt Bonds during the Class Period.  Throughout the Class Period, Citigroup Global Markets Limited distributed Gilt Bonds into the United States and transacted Gilt Bonds directly with investors in the United States.

44.     In addition to its own direct transactions, Citigroup Global Markets Limited also transacted Gilt Bonds in the United States through Citigroup Global Markets Inc., an affiliate

---

[8]     Deutsche Bank Aktiengesellschaft, Annual Report (Form 20-F) (Mar. 20, 2017) at 76, 84.

operating as part of the same Citigroup Inc. business line.  Citigroup Global Markets Inc., acting on behalf of Citigroup Global Markets Limited, transacted Gilt Bonds directly with investors in the United States, including Plaintiff Oklahoma Firefighters.  These trades were priced by traders at Citigroup Global Markets Limited and executed using Citigroup Global Markets Limited's Gilt Bond inventory.

45.     Defendant Citigroup Global Markets Inc. is a New York corporation with its principal place of business at 388 Greenwich Street, New York, New York 10013.  It is a wholly-owned SEC-registered broker-dealer subsidiary of Citigroup Inc.

46.     Citigroup Inc. organizes its activities on a "business line" basis.  Both Citigroup Global Markets Limited and Citigroup Global Markets Inc. operate within the "Markets and Securities Services" business line, known during the Class Period as "Global Markets."  Markets and Securities Services personnel around the world are responsible for Citigroup's sales and trading of fixed income products, including Gilt Bonds, despite being employed by nominally separate legal entities.  Citigroup Inc. reported the results from both Citigroup Global Markets Limited and Citigroup Global Markets Inc. together under its Markets and Securities Services business line, boasting that the "breadth, depth and strength of our sales and trading, distribution, and research capabilities span a broad range of asset classes, currencies, sectors and products," including Gilt Bonds.

47.     During the Class Period, Citigroup Global Markets Inc. executed Gilt Bond transactions directly with investors in the United States, including Plaintiff Oklahoma Firefighters.

48.     Accordingly, throughout the Class Period, the Citigroup Defendants purposefully availed itself of the US market for Gilt Bonds.

**The RBC Defendants**

49.     Defendant RBC Europe Limited f/k/a Royal Bank of Canada Europe Limited ("RBC Europe") is a UK private limited company with its principal place of business at 100 Bishopsgate, London, EC2N 4AA, United Kingdom.

50.     RBC Europe is a wholly-owned subsidiary of Royal Bank of Canada.  Royal Bank of Canada is a multinational banking institution, organized as a Canadian chartered bank.  Its principal place of business is located at 200 Bay Street, Toronto A6 M5J2J5, Ontario, Canada.

51.     During the Class Period, RBC Europe served as a Gilt Bond primary dealer and actively cultivated the US market for Gilt Bonds by distributing Gilt Bonds into the United States and transacting Gilt Bonds directly with investors in the United States.

52.     Royal Bank of Canada operates three federal branches in the United States, all of which are subject to regulation and supervision by the Office of the Comptroller of the Currency ("OCC") and the Board of Governors of the Federal Reserve System.  Its New York federal branches are located at 3 World Financial Center, 200 Vesey Street, New York, New York 10281. Royal Bank of Canada's stock is also registered with the SEC and is listed on the New York Stock Exchange.

53.     In addition to its own direct transactions, RBC Europe also transacted Gilt Bonds with US investors through its New York-based, SEC-registered broker-dealer affiliate, Defendant RBC Capital Markets, LLC.  Defendant RBC Capital Markets, LLC f/k/a Dain Rauscher Inc. ("RBC Capital Markets") is a Minnesota limited liability company with its principal place of business at Three World Financial Center, 200 Vesey Street, New York, New York 10281.  RBC Capital Markets is a wholly-owned subsidiary of Royal Bank of Canada and an SEC-registered broker-dealer.

54.     Royal Bank of Canada recognizes the revenues from RBC Capital Markets LLC and RBC Europe and reports these revenues on a consolidated basis.  Royal Bank of Canada organizes its business into several "business lines."   Gilt Bond sales and trading personnel nominally employed by both RBC Capital Markets LLC and RBC Europe jointly carried out Royal Bank of Canada's Gilt Bond business as part of the "Capital Markets" business line.

55.     For example, RBC Capital Markets LLC and RBC Europe share a brand name, RBC Capital Markets.  In annual reports, Royal Bank of Canada makes clear that personnel operating within its Capital Markets business line operate jointly, writing that Royal Bank of Canada is a "leading North American investment bank with select global reach" and that the objectives for its Capital Markets business line were "[e]xpanding and strengthening client relationships in the U.S." while also "[b]uilding on core strengths and capabilities in the UK, Europe, and Asia."  Employees at RBC Capital Markets LLC and RBC Europe worked jointly to carry out these objectives and, with respect to their Gilt Bond businesses, to trade European Government Bonds from RBC Europe's inventory with US investors.

56.     Royal Bank of Canada reports that RBC Capital Markets LLC provides clearing services (managing the exchange of money and financial products) for affiliated companies when engaging in financial transactions in the United States, including Gilt Bond transactions executed in the United States using RBC Europe's Gilt Bond inventory.

57.     Royal Bank of Canada is responsible for compliance and internal controls across its Capital Markets business line, including operations carried out by RBC Europe and RBC Capital Markets LLC.

58.     Traders at RBC Europe priced all Royal Bank of Canada's and New York-based, SEC-registered broker-dealer RBC Capital Markets LLC's Gilt Bond transactions with US

investors during the Class Period, and these transactions were executed using RBC Europe's Gilt Bond inventory.

59.     Throughout the Class Period, RBC Capital Markets engaged in Gilt Bonds sales and trading in the United States, distributed Gilt Bonds to US investors as an agent of its affiliate RBC Europe, and transacted Gilt Bonds directly with investors in the United States.

60.     RBC Europe's and Royal Bank of Canada's domestic operations, either directly or through its US subsidiaries, led to significant sales of Gilt Bonds to customers in the US.

61.     Accordingly, throughout the Class Period, the RBC Defendants purposefully availed themselves of the US market for Gilt Bonds.

**The HSBC Defendants**

62.     HSBC Holdings plc is a British multinational universal bank and financial services holding company.  Its principal place of business and headquarters is located at 8 Canada Square London E14 5HQ, United Kingdom.  HSBC Holdings plc's stock is registered with the SEC and is listed on the New York Stock Exchange.

63.     Defendant HSBC Bank plc is a wholly-owned subsidiary of HSBC Holdings Inc. that is principally located and headquartered at the same address at its parent company.

64.     During the Class Period, HSBC Bank plc served as a Gilt Bond primary dealer and actively cultivated the US market for Gilt Bonds by distributing Gilt Bonds into the United States and transacting Gilt Bonds directly with investors in the United States, including Plaintiff Oklahoma Firefighters.

65.     In addition to its own direct transactions, HSBC Bank Plc also transacted Gilt Bonds in the United States through HSBC North America Holdings Inc., a New York-based subsidiary.  HSBC North America Inc. is the parent company to HSBC Securities (USA) Inc.,

which operates as a US affiliate broker for Gilt Bonds transactions with US investors. HSBC Securities (USA) Inc. is headquartered at 452 Fifth Avenue, New York, New York 10018

66.     Defendant HSBC Securities (USA) Inc. engaged in Gilt Bonds sales and trading in the United States, distributed Gilt Bonds to US investors as an agent of its parent entities, and transacted Gilt Bonds directly with investors in the United States.  During the Class Period, HSBC Securities (USA) Inc. was a counterparty to Gilt Bonds transactions with Plaintiff Oklahoma Firefighters.

67.     Throughout the Class Period, HSBC's domestic operations, either directly or through its US subsidiaries, led to significant sales of Gilt Bonds to customers in the United States, including Plaintiff Oklahoma Firefighters.

68.     Accordingly, the HSBC Defendants purposefully availed themselves of the US market for Gilt Bonds.

### The Morgan Stanley Defendants

69.     Morgan Stanley is a multinational investment bank and financial services company with its headquarters located at 1585 Broadway, New York, NY 10036.  Morgan Stanley's stock is registered with the SEC and is listed on the New York Stock Exchange.

70.     Defendant Morgan Stanley & Co. International PLC is a public limited company, and wholly owned subsidiary of Morgan Stanley, with its principal place of business at 20 Cabot Square Canary Wharf, London E14 4QW, United Kingdom.

71.     During the Class Period, Morgan Stanley & Co. International Plc served as a Gilt Bond primary dealer and actively cultivated the US market for Gilt Bonds during the Class Period through direct transactions to US customers and transactions in the US that were executed through Morgan Stanley & Co. LLC.

72.     Defendant Morgan Stanley & Co. LLC is a US based affiliate broker for Gilt Bond transactions with headquarters at 1585 Broadway, New York, NY 10036.

73.     Throughout the Class Period, Morgan Stanley's domestic operations led to significant sales of Gilt Bonds to customers in the United States.  Accordingly, throughout the Class Period, the Morgan Stanley Defendants purposefully availed themselves of the US market for Gilt Bonds.

74.     Various other entities and individuals unknown to Plaintiff at this time likely participated as co-conspirators in the acts complained of and performed acts and made statements that aided and abetted and were in furtherance of the unlawful conduct alleged in this Complaint.

## FACTUAL BACKGROUND

### A.     Gilt Bond Market

75.     The UK government issues debt in the form of bonds, which are typically used to fund ongoing and future operations.  These "Gilt" Bonds, as they are commonly known, are issued on the primary market by His Majesty's Treasury on behalf of the UK Debt Management Office ("DMO"), and are subsequently traded on the secondary market.  The name "Gilt" derives from the industry recognition that UK government bonds are considered one of the safest and most attractive forms of lending and were historically issued on certificates with gold-leaf edges.

76.     The Gilt Bonds market is comprised of two different types of securities – Conventional Gilts and Index-linked Gilts.  Conventional Gilt Bonds pay the holder a fixed cash payment (coupon) every six months until the maturity date, at which point the holder receives the final coupon and return of the principal.  During the Class Period, approximately 70%-75% of the Gilts in issue were Conventional in form.  Index-linked Gilt Bonds, on the other hand, are adjusted to account for accrued inflation from the issue date.

77.     The maturity for Gilt Bonds can range between several months to 55 years.  During the Class Period, the average maturity for outstanding Conventional Gilt Bonds was 15 years and for Index-linked Gilt Bonds was 21 years.  By 2014, there were over 72 Gilt Bonds in issue that had not yet reached maturity with a total outstanding value of almost one and a half trillion sterling pounds (£1.5 trillion).  Approximately 30% of that value was held by parties residing outside of the UK.

78.     The Gilt Bonds market operates independently and under a separate legal and regulatory framework from other European countries' bond markets.  While the UK was a member of the European Union until 2020, the UK was never a member of the Eurozone.  Eurozone member countries are regulated by the European Council and European Central Bank to integrate their monetary and economic policies.  Additionally, the Gilt Bonds market has a close relationship with the UK central bank, The Bank of England.  The Bank of England actively participates in the Gilt Bonds market through open market operations, such as quantitative easing programs, which impacts Gilt Bond prices.  Quantitative easing is a tool used by The Bank of England to meet its inflation target for the economy.  It involves purchasing bonds to push up their prices, reduce long-term interest rates, and, in turn, place upward pressure on the prices of goods and services.  The Bank of England first began utilizing quantitative easing in March 2009 in response to the Global Financial Crisis.  Use of quantitative easing was widespread during the Class Period.

79.     The Gilt Bonds market has distinct economic characteristics due to the scale and global impact of the UK's economic performance. The market conventions, liquidity, currency, price, and credit risk associated with the Gilt Bonds market are unique from other European bonds.

80.     Banks who participate in the Gilt Bonds market typically have specialized teams working at trading desks that focus on Gilt Bond trading and transactions.  These trading desks,

located at the London offices of each bank, actively buy and sell Gilt Bonds on behalf of their bank and clients, manage risk associated with Gilt trading positions, determine pricing, and provide other market-making services.  These desks also remain distinct from other desks trading other instruments, such as European government bonds or sovereigns, supranationals, and agencies ("SSA") bonds.  Defendants organized their Gilt Bonds businesses in this manner.

81.    Global holdings of Gilt Bonds were approximately $1.86 trillion (£1.5 trillion) as of 2013.  The United States is a prominent market for Gilt Bonds, with hundreds of billions of dollars in trading volume annually.

**B.    Gilt Bonds Primary Market**

82.    Since 1995, auctions have constituted the primary means of issuance for both Conventional and Index-linked Gilt Bonds. Gilt Bonds are regularly issued and sold at auction by the DMO.  The sale of Gilt Bonds at auction is known as the "primary market."  The bonds are allocated to banks who have been authorized to bid and designated as a GEMM by the DMO.

83.    The DMO conducts a multiple price auction for Conventional Gilt Bonds.  GEMM banks submit bids specifying the quantity of bonds they wish to purchase and the prices they are willing to pay.  The DMO determines the cutoff yield or price at which the bonds will be allocated based on the bids received.  The multiple price auction system allows for a range of accepted bids at different prices.  The successful bidders will be allocated Gilt Bonds at the prices they bid, provided their bids are at or above the cutoff yield or price determined by the DMO.

84.    The DMO conducts auctions for Index-linked Gilt Bonds on a single price basis. In this system, successful bidders pay the lowest accepted price and non-competitive bids are also allocated at this lowest accepted price.  Additionally, the DMO offers Gilt Tenders for existing Gilt Bonds (conventional and index-linked) for a lower size (in cash terms) than a typical auction. Retail investors can participate in primary market auctions and purchase Gilt Bonds directly from

the CMO if they have been accepted into the "Approved Group of Investors" and limit their involvement to a single non-competitive bid.   However, any investor that wants to bid competitively or bid over £500,000 must transact with a GEMM.  Although auctions constitute the primary means of Gilt Bond issuance, the DMO may also issue Gilt Bonds through syndicated offerings, in which a group of banks underwrites and conducts the initial sale.

85.    To ensure active participation in their auctions, the DMO selects a relatively small group of banks to serve as GEMMs or "primary dealers" of Gilt Bonds.  These primary dealers control a significant amount of Gilt Bonds issued in auctions.  The Primary Dealer Defendants are GEMMs of Gilt Bonds.

86.    The banks are selected by the DMO to serve as GEMMs based on the following criteria:

(a)      their experience in and commitment to the UK Gilt Bond market;

(b)      their ability to make markets for investors in the post-auction or "secondary market" and commitment to maintain a minimum individual secondary market share; and

(c)      their financial strength, which includes their credit rating, balance sheet capability, capitalization, and appetite for risk.

87.    GEMMs are obligated to play an active role in the issuance, distribution, and marketing of Gilt Bonds and are expected to purchase at least 2.0% of issuance by sector – Conventional and Index-linked – on a six-month rolling average basis.  Put another way, each GEMM is generally required at each auction to bid a minimum percentage of the full offering. The DMO designates a specific number of GEMMs as market makers for each issuance who must participate in that specific auction.  This is to ensure that, in the event that no one outside of the

primary dealer group bids in a given auction, all of the auctioned Gilt Bonds will still be purchased by the primary dealers.  It also ensures that primary dealers receive a continuous supply of newly issued Gilt Bonds to trade with investors.

88.     In return for undertaking these obligations, GEMMs are entitled to a share of a non-competitive allowance of 15% of the total amount of the bonds on offer at Gilt Bond auctions and are granted preferred counterparty status, among other privileges – including the ability to strip Gilt Bonds and trade parts of the instrument separately.  In Conventional Gilt Bond auctions, the 15% allowance is split pro-rata by participating GEMMs.  In Index-linked Gilt Bond auctions, individual GEMM's share of the 15% allowance is determined by reference to each GEMM's successful competitive bidding results in the three previous Index-linked Gilt Bond auctions.

89.     GEMMs are encouraged to and do provide valuable information to the DMO. GEMMs often acquire and possess significant amounts of information about client demand and order flows in their roles as market makers.  Certain investors, including pension funds and life insurance companies, have long-dated liabilities on their balance sheet that they need to hedge. Gilt Bonds have longer durations and lower credit risk than corporate bonds and, therefore, can more effectively hedge certain forms of long-term liabilities.  As these bonds mature, and as the assets under management grow, there is a constant need for bond proceeds to be re-invested to keep the average maturity of the portfolio constant, month-in, month-out.

90.     Through the information GEMMs receive about customer demand, primary dealers can judge interest in the auction, and in turn, the likely trading activity for auctioned Gilt Bonds in the secondary market.  Given the wealth of information primary dealers acquire through their customers, the DMO relies heavily on primary dealers' knowledge of investor appetite to better

understand what type of offering will attract the most interest in the issuance. Indeed, often prior to the auction, the DMO will discuss with GEMMs how the market is evaluating an offering.

91.     The DMO monitors the performance of primary dealers in the auctions, ranking them based on how aggressively they bid in the auction – *i.e.*, whether primary dealers will bid large amounts of the auctioned bonds at high prices. The DMO then publishes a ranking of GEMMs according to how well they are deemed to have met the obligations of that primary dealership. GEMMs that consistently obtain the largest portions of auctioned Gilt Bonds are ranked higher than dealers that do not.

92.     Primary dealers are economically incentivized to maintain a high ranking because it gives them opportunities to participate in even more lucrative transactions with the issuer. One such lucrative opportunity for top-ranked primary dealers is serving as a lead manager of a syndicated issuance. Syndicate managers then have the responsibility and opportunity for market-making in the secondary market for the security. Top-ranked primary dealers also receive preference in derivative transactions, including entering into interest rate swap transactions with the DMO to hedge risk in the UK portfolio.

### C.     Trading in the Gilt Bonds Secondary Market

93.     After the initial issuance of Gilt Bonds in the primary market, these bonds are further traded for investing and hedging purposes among bond dealers and investors – including pension, hedge, and mutual funds; domestic and international banks; insurance companies and other corporations; and state and local governments in the Over-the-Counter ("OTC") secondary market. There is an active secondary market for Gilt Bonds in the United States.

94.     Defendants dominate the secondary market, acting as market makers by providing liquidity to investors and standing ready to buy and sell Gilt Bonds whenever an investor seeks to do so. Defendants can trade Gilt Bonds for cash consideration or, through a Gilt Bond Asset Swap,

can exchange the bonds for a package of other assets that typically also includes a cash component.[9]

95.    In fact, GEMMs are expected to make effective two-way prices on demand to any of their clients, at all times and in any conditions, in all Gilt Bonds in which they have been recognized as a primary dealer and maintain a minimum individual market share of Gilt Bonds available on the secondary market.

96.    Customers seeking to buy or sell Gilt Bonds may contact one or more banks, such as Defendants or other GEMMs, and request pricing for a particular Gilt Bond.  The bank will quote the price for a Gilt Bond in terms of a "bid" or an "ask," which are usually set in terms of basis points (one basis point equals 1/100 or 1%).  The bid represents the price at which a dealer will purchase the Gilt Bond; the ask represents the price at which a dealer will sell the Gilt Bond. The difference between these two values is the "bid-ask spread" (or "spread"), which reflects the dealer's profit for acting as a market maker and assuming the risk that it may be unable to buy or sell Gilt Bond in the future at better prices than it is quoting at the time to its customer.

97.    As is typical in many financial markets, trading of Gilt Bonds during the Class Period was done through telephonic and, increasingly, electronic means.  Salespersons at the dealer banks take orders and then relay them to bond traders at the banks' trading desks so that they can be filled.

98.    Rational customers want to buy low and sell high.  Banks, including Defendants and their bond traders, compete for customers based on the bid and ask prices they offer, and, in turn, the spread between them.  The narrower the bid-ask spread, the more competitive the prices.

---

[9]    Generally, an asset swap is a type of transaction whereby an investor acquires a bond position, such as in Gilts, and then enters into an interest rate swap with the bank selling the bond.  This is a tool for investors to hedge different types of risk by substituting fixed coupon interest rates of, for example, a bond with assets carrying periodically adjusted floating interest rates.

A bank can gain customers and business by offering a narrower bid-ask spread than its competitors. Conversely, if a bank widens the bid-ask spread – by either lowering the bid or raising the ask (or both) – it would likely lose customers to rivals offering narrower spreads. Only through collusion can a dealer quote a wider spread than market conditions otherwise dictate without losing market share and profits.

### D. Structure of Defendants' Gilt Bond Businesses

99.     Defendants' Gilt Bond trading and sales personnel are housed within each bank's respective fixed income division. An entity within this division serves as a primary dealer for Gilt Bonds. Traders employed at the primary dealer entity are also responsible for determining pricing for Gilt Bond trades with investors. The Primary Dealer Defendants performed this function on behalf of their respective banking groups during the Class Period.

100.    The primary dealer entity acquires Gilt Bonds from the DMO in the primary market. The traders who undertake primary dealing responsibilities are typically located in the bank's London office. When primary dealers acquire Gilt Bonds, they place them into inventory and distribute them, as needed, to fill customer orders, through the bank's sales and trading network to trading hubs located in major financial centers, including in the United States. Sales personnel at these trading hubs help their respective Gilt Bond primary dealers by interacting with investors, managing client relationships, and receiving and implementing customer Gilt Bond orders from trading desks. As described above, Defendants' US entities performed this function in the United States during the Class Period.

101.    For example, when a salesperson in the United States sells a Gilt Bond to a customer, a trader at the primary dealer entity is responsible for determining the price charged to the customer and executes an internal transaction from the primary dealer's inventory to send the Gilt Bond to the bank's US trading desk, which then delivers the bond to the customer. Through

these internal transactions, the primary dealer entities distribute Gilt Bonds into the United States through their respective US desks to US investors.

102.    Defendants' primary dealer entities transacted Gilt Bonds directly with customers located in the United States.  On other occasions, Defendants also distributed Gilt Bonds to US customers through their US-based broker-dealer affiliates.

### E.    Pricing of Gilt Bonds

103.    As with other bonds, the prices of Gilt Bonds are stated in terms of the bond's par value, coupon, maturity date, and yield.  A bond's par value is its face value, payable on the bond's maturity date.  A bond's coupon is the interest rate that the bond issuer must pay an investor. Coupons are paid to the bond-holder periodically until the bond reaches maturity.  Yield is a figure that shows the return that an investor receives by holding the bond to maturity.

104.    Bond prices can be quoted as a function of the bond's par value or its yield.  A bond with a par value of £1,000 may sell at a discount of 2%, or £980.  Gilt Bonds are also quoted in fractions of a British sterling pound (*e.g.*, 1/32).  In the example above, a £1,000 par value bond may be quoted at "98-23."  The "98" reflects the "handle" and the "23" reflects the number of "32nds" (*i.e.*, 23/32).  The bond's price off of par can be determined by dividing 23 into 32 (0.71875) and adding that to the handle of "98," which provides the bond's price as a percent of the bond's £1,000 face value – *i.e.*, 98.71875% or £987.1875.  A bond may sell at a discount because its coupon is lower than prevailing interest rates in the marketplace, which means that in order to sell it, the holder must lower the price of the bond to make it competitive with other bonds in the market.

105.    A bond's price can also be quoted in terms of its yield.  Bond price and yield have an inverse relationship: lowering one will result in a rise in the other, as demonstrated by Figure 3 below:

**Figure 3 – Relationship Between Bond Price and Yield**



106.   This inverse relationship is due to the fact that a bond's price will be higher when it pays a coupon that is higher than prevailing interest rates.  As market interest rates increase, bond prices decrease.  Because yield takes into account both a bond's coupon and its price, yield can be an effective means to compare bonds with different coupons, prices, and terms to maturity.

**DEFENDANTS' WRONGFUL CONDUCT**

107.   Defendants and their co-conspirators fixed bid-ask spreads on customer orders for Gilt Bonds in the post-auction, secondary market.  Defendants orchestrated their bid-ask spread fixing primarily through non-public, invitation-only, cross-bank electronic chatrooms, where Defendants' traders discussed allocations in the primary market, bidding and trading strategies, customer orders, the bid and ask prices offered to customers seeking a quote, and the prices of executed trades.  Primary dealers are particularly well placed to see order information and estimate bond demand, allowing them to disclose information that may decrease uncertainties regarding the demand and thus the price of the bonds in the secondary market.  Client order information is highly

sensitive, and sharing this information with competitors is considered grounds for termination.[10]

Further, the CMO prohibits GEMMs from collusive behavior and the improper disclosure of

trading interests, bids/offers, or transactions that may be subject to confidentiality obligations or

is in violation of UK competition law.

108.    Exchanging this information is prohibited, yet profitable for the Defendants,

because it alerts horizontal competitors to the prices at which customers are valuing bonds,

allowing conspirators to raise their offers (in the case of a customer purchase) or lower their bids

(in the case of a customer sale)[11] to collect additional profits.  This conduct caused a corresponding

loss to Defendants' customers, who unknowingly transacted at prices fixed by Defendants instead

of prices set by supply and demand.

109.    Absent an agreement to fix bid and ask prices, no individual bank could afford to

engage in such conduct unilaterally.  To do so would result in that bank losing substantial trading

business to competitors offering more competitive pricing.  Further, consistently quoting non-

competitive bid and ask prices would risk the bank's lucrative position as a primary dealer in Gilt

Bonds.

110.    As was the case in other financial market cartels, through electronic

communications, Defendants' traders exchanged confidential information about their customers'

identities and orders (including, among other things, size, direction, and price).

111.    The CMA specified that Defendants' information exchange occurred in the context

of: "the sale of gilts by the UK Debt Management Office via auctions on behalf of HM Treasury;

---

[10]    *See, e.g.*, Patrick Gower, *Barclays Trader Fired Amid FX Probe Is Third to Lose Lawsuit*, BLOOMBERG
BUSINESS  (May  26,  2017),  https://www.bloomberg.com/news/articles/2017-05-26/barclays-trader-fired-amid-fx-
probe-is-third-to-lose-lawsuit#xj4y7vzkg.

[11]    An artificially raised ask price (or artificially lowered bid price) increases the difference between the bid and
the ask (*i.e.*, the bid-ask spread).  *See* Part IV.E above, and Part VI.B below.

the subsequent buying and selling of gilts and gilt asset swaps; [and] buy-back auctions of gilts by the Bank of England (for example, for quantitative easing)."[12]

112.    By exchanging this sensitive pricing and customer information, the conspiring traders could manipulate the price and allocation of bonds in the primary market and coordinate the bid/ask prices they offered to their respective customers in the secondary market.

113.    In executing this conspiracy, Deutsche Bank operated as the information hub for coordination between the Defendants.  Defendants' Gilt Bond traders would share confidential information, including "details on pricing and other aspects of their trading strategies," with the Deutsche Bank trader and the Deutsche Bank trader would disseminate the information in individual chatrooms with each Defendant.[13]  This conduct was illustrated by the CMA in Figure 4 below.

**Figure 4 – Defendants' Communications During Class Period**



Image credit: CMA

---

[12]    *See supra*, n.1

[13]    *Id.*

114.    Defendants' Gilt Bond traders communicated with each other frequently.  The repetitious nature of Defendants' traders' private chatroom discussions enabled them to both coordinate on pricing and effectively police their conspiracy.  A conspiring bank's trader who failed to adhere to agreed-upon pricing could quickly be identified and barred from any further participation in the chatrooms.  Accordingly, the Gilt Bond traders had little incentive not to adhere to their agreement.

115.    By communicating about aligning the prices and spreads they quoted to investors, Defendants also discouraged investors from comparing prices.  Shopping around for better pricing was ultimately a pointless endeavor because the quotes received from one cartel member would be substantially similar to those offered by the other cartel members.  From the customer's perspective, the matching quotes suggested that the prices offered by any one cartel member were competitive.  Unbeknownst to the customer, however, these prices were actually the product of collusion between the conspiring banks' Gilt Bond traders.

116.    As a result of Defendants' price-fixing agreement, investors, including Plaintiff and the Class, either paid artificially high prices for Gilt Bonds they bought, or received artificially low prices for the Gilt Bonds they sold, causing Plaintiff and the Class injury to their business or property.

## INVESTIGATION BY THE UNITED KINGDOM
## COMPETITION AND MARKETS AUTHORITY

### A.    The CMA Issues Statement of Objections to the Defendants

117.    On May 24, 2023, the Commission announced it had sent a Statement of Objections to Defendants Deutsche Bank, Citigroup, HSBC, RBC, and Morgan Stanley informing them of the CMA's "provisional[] finding that [they] broke competition law by each unlawfully sharing competitively sensitive information through one or more series of one-to-one conversations in

chatrooms" concerning "the buying and selling of UK government bonds – specifically gilts and asset swaps . . . between 2009 and 2013."[14]  According to the report, the CMA opened its investigation in November 2018.  From November 2018 to August 2019, the CMA conducted its initial information gathering, including through formal information requests and responses.  From August 2019 to December 2020, the CMA reviewed and analyzed the information gathered.  And in the time between January 2021, and the issuance of the Statement of Objections in May 2023, the CMA conducted collection and examination of additional evidence.[15]

118.    In the CMA's accompanying Press Release for the Statement of Objections, the CMA specified that these information exchanges "took place in one-to-one Bloomberg chatrooms between a small number of traders who worked at the banks" and that the communications "included details on pricing and other aspects of their trading strategies."[16]

119.    The CMA found that "[b]y unlawfully exchanging competitively sensitive information rather than fully competing, the banks involved in these arrangements could have denied the full benefits of competition to those they traded with – including, among others, pension funds."[17]

120.    The CMA Executive Director of Enforcement, Michael Grenfell, said:

Our provisional decision has found that, in the aftermath of the global financial crisis, 5 global banks broke competition law by taking part in a series of one-to-one online exchanges of competitively sensitive information on pricing and other aspects of their trading strategies on UK bonds.  This could have denied taxpayers, pension savers and financial institutions the benefits of full competition for these products, including the minimisation of borrowing costs.

---

[14]      *See supra*, n.3.

[15]      *Id.*

[16]      *See supra*, n.1

[17]      *Id.*

> A properly functioning, competitive bond market benefits tens of millions of taxpayers and pension savers as well as being at the heart of the UK's reputation as a global financial hub.  These alleged activities are therefore very serious and warrant the detailed investigation we have undertaken.[18]

121.    According to the CMA, the Defendants are now on notice "of a proposed infringement decision under the competition law prohibitions in the [UK] Competition Act 1998."[19]  Chapter 1 of the UK Competition Act 1998 prohibits "agreements between undertakings, decisions by associations of undertakings or concerted practices" that "may affect trade within the United Kingdom" and "have as their object or effect the prevention, restriction or distortion of competition within the United Kingdom," including specifically, among other unlawful practices, "agreements, decisions or practices" to "directly or indirectly fix purchase or selling prices or any other trading conditions"; "limit or control production, markets, technical development or investment"; or "share markets or sources of supply."  (Competition Act 1998, c. 1 (UK)).  Accordingly, Chapter I is the UK equivalent of Article 101 Treaty on the Function of the EU and Section 1 of the Sherman Antitrust Act.

## B.    The CMA Investigative Process and Procedure

122.    In the UK, competition law is applied and enforced principally by the CMA.  The CMA investigates and enforces the Chapter I (anticompetitive agreements) and Chapter II (abuse of dominance) prohibitions in the UK Competition Act 1998.

123.    According to the CMA, once their investigation and fact-finding is complete, if "the CMA's provisional view is that the conduct under investigation amounts to an infringement, the

---

[18]    *Id.*

[19]    *Id.*

CMA will issue a Statement of Objections to each business it considers to be responsible for the infringement."[20]

124.    To investigate a potential action, "[t]he CMA has a range of powers to obtain information to help it establish whether an infringement has been committed."[21]  These powers allow the CMA to:  (i) require the production of specified documents or information; (ii) conduct interviews and require individuals to answer oral questions; (iii) enter and search premises with a warrant; and (iv) send formal information requests in writing to obtain information.[22]

125.    "Throughout an investigation, the CMA routinely reviews and analyses the information in the CMA's possession to test the factual, legal and economic arguments and to establish whether it supports or contradicts the theory/ies of competition harm."[23]

126.    "The CMA regularly scrutini[z]es the way it handles the investigation and routinely assesses the evidence before it, to ensure that its actions and decisions are well-founded, fair and robust. This involves seeking internal advice from specialist advisers on the legal, policy and economic issues that arise throughout the investigation."[24]

127.    The Commission's investigation process is outlined in Figure 5, below.

---

[20]    GOV.UK, Competition & Markets Authority, Guidance on the CMA's investigation procedures in Competition Act 1998 cases: CMA8, *Issuing the CMA's provisional findings – the Statement of Objections and Draft Penalty Statement* (Dec. 10, 2021), https://www.gov.uk/government/publications/guidance-on-the-cmas-investigation-procedures-in-competition-act-1998-cases/guidance-on-the-cmas-investigation-procedures-in-competition-act-1998-cases#issuing-the-cmas-provisional-findings--the-statement-of-objections-and-draft-penalty-statement.

[21]    *Id.*

[22]    *Id.*

[23]    *Id.*

[24]    *Id.*

**Figure 5 – CMA's Case Investigation Process**



128.    If the CMA confirms the violation, certain Defendants could be subject to substantial fines.

### C.    Defendants Deutsche Bank and Citigroup Admitted Participation in Alleged Conduct

129.    Defendant Deutsche Bank disclosed that it has been granted "'provisional immunity'" after "proactively reporting the activities."[25]  Defendant Citigroup disclosed that it had "cooperated fully with the CMA on the matter" and has also struck a settlement with the CMA for a discount on any fine imposed.[26]

---

[25]        *See supra*, n.5.

[26]        *Id.*

130.    The CMA's grant of provisional immunity to Deutsche Bank for "alert[ing] the CMA to its participation in the alleged unlawful behavior" is significant.  Under the CMA leniency program, the CMA has the power to grant "total immunity" if the violating business confesses their anticompetitive conduct to the CMA.

131.    Citi has also applied for leniency under the CMA leniency program.  Under the program only one applicant, typically the first to apply, can receive total immunity. However, later applicants who alert the CMA to anticompetitive can receive a leniency discount from fines. The CMA has confirmed that "any fine that Citi receives will be discounted" provided it continues to cooperate with the leniency program. The CMA has also confirmed that Citi will receive a further, separate discount for its settlement. The settlement with Citigroup is also significant.

> In the context of enforcement cases under the CA98, 'settlement' is the process whereby a business under investigation is prepared to admit that it has breached competition law and confirms that it accepts that a streamlined administrative procedure will govern the remainder of the CMA's investigation. If so, the CMA will impose a reduced penalty on the business.[27]

132.    By the CMA's own regulations, a recipient of immunity or settling party must admit its participation in and submit evidence of a cartel in violation of UK competition law.  Deutsche Bank and Citigroup have admitted participation in a cartel that agreed to prevent, restrict, or distort competition in the Gilt Bonds market.[28]

---

[27]    GOV.UK, Competition & Markets Authority, Guidance on the CMA's investigation procedures in Competition Act 1998 cases: CMA8 (Dec. 10, 2021), https://www.gov.uk/government/publications/guidance-on-the-cmas-investigation-procedures-in-competition-act-1998-cases/guidance-on-the-cmas-investigation-procedures-in-competition-act-1998-cases#fn:169.

[28]    Per CMA guidance, "A cartel is an agreement between businesses not to compete with each other.  The agreement can often be verbal.  Typically, illegal cartels involve cartel members agreeing on price fixing, bid rigging, output quotas or restrictions, and/or market sharing arrangements.  In some cartels, more than one of these elements may be present." *Id.* at n.7.

## THE GILT BONDS MARKET STRUCTURE SUPPORTS
## <u>THE EXISTENCE OF A GILT BOND CARTEL</u>

133.     Features of the Gilt Bonds market support the inference of concerted action by

Defendants to fix, raise, maintain, stabilize, or otherwise manipulate the prices of Gilt Bonds.

134.     *First*, the Gilt Bonds market has high barriers to entry.

135.     The Bank for International Settlements, a policy and research organization owned

by 60 of the world's leading central banks, explained that barriers to entry for prospective dealers

in OTC markets like the Gilt Bonds market include:

> [A] sufficiently large client base to get a good view of the flow of orders; the
> capacity to take on large principal positions; continuous access to multiple markets,
> including funding and hedging markets; the ability to manage risk, especially the
> risk of holding assets in inventory; and market expertise in providing competitive
> quotes for a range of securities.[29]

136.     *Second*, the structure of the secondary market for Gilt Bonds was susceptible to

collusion.

137.     The Gilt Bonds market is characterized by very large, relatively infrequent

customer transactions and is dominated by large players executing large transactions, such as, for

example, The Bank of England's bond purchases in service of its quantitative easing programs.

Further, the relatively lower volume of transactions, as compared to other fixed income products,

allowed Defendants to monitor, coordinate, and police each other's quoting behavior.

138.     Additionally, investor participation in the Gilt Bonds market is marked by fairly

routine and predictable trading schedules.  Certain US pension and investment funds holding Gilt

Bonds have investment mandates that require periodic rebalancing of fixed income portfolios to

address fluctuations in the credit and interest rate risk of their investments.  This rebalancing can

---

[29]     *Quarterly Review: International banking and financial market developments*, at 99, BANK FOR
INTERNATIONAL SETTLEMENTS (Mar. 2015), https://www.bis.org/publ/qtrpdf/r_qt1503.pdf.

include, among other things, the purchase of newer (*i.e.*, on-the-run) Gilt Bond issues and the sale of older (*i.e.*, off-the-run) Gilt Bond issues. Rebalancing generally occurs at regular monthly or quarterly intervals. These predictable trading patterns by investors facilitated Defendants' coordination of prices to investors seeking to buy and sell Gilt Bonds.

139. ***Third***, pre-trade price discovery for non-dealers in the Gilt Bond market is difficult. There is no central, all-to-all, exchange where dealers and non-dealers alike can see bid and ask quotes in real-time, as there are for other asset classes. Customers do not have access to the real-time price feeds available to dealers on interdealer broker platforms. Rather, customers need to request quotes from individual dealers (including Defendants) – either electronically or through phone communication.

140. Without access to reliable pricing information, investors like Plaintiff were forced to turn to Defendants when transacting in Gilt Bonds and to rely on Defendants to provide competitive Gilt Bond pricing.

141. Transparency enables investors to identify dealers that offer superior prices, allowing them to seek out those dealers. Thus, transparency helps the most competitive dealers attract market share. However, price transparency was a risk to Defendants' and their co-conspirators' cartel because it would have allowed investors to see prices charged by Gilt Bond dealers not participating in the cartel. Keeping the status quo enabled Defendants and their co-conspirators to continue dictating anti-competitive prices to uninformed investors handicapped by an inability to observe prices for Gilt Bond transactions. Had Plaintiff and the Class been able to observe market-wide pricing, it would have been readily apparent that Defendants and their co-conspirators were charging uniform, supra-competitive prices.

142.   *Fourth*, Defendants' conduct was contrary to their individual economic interests. For example, if a Defendant unilaterally widened its bid-ask spread prices to customers on a consistent basis, while others failed to do similarly, few would trade with that conspiring bank. Moreover, consistently failing to keep competitive spreads or make markets for customers would jeopardize a conspiring bank's privileged status as a GEMM and primary dealer with Gilt Bond issuers, potentially leading to the revocation of these privileges.  If a conspiring bank lost its primary dealer status, it would no longer have privileged access to bonds on the primary market and market information from the DMO.  This would, in turn, make that conspiring bank's services less attractive to Gilt Bond customers.

143.   *Fifth*, in the absence of a conspiracy, sharing proprietary trading information was contrary to Defendants' individual economic interests.  Sharing trading and pricing information would have been dangerous in the hands of true competitors during the Class Period because it would allow rival dealers to "trade ahead" of the dealer's disclosed trade in the dealer-to-dealer market.  Trading ahead occurs where a dealer learns ahead of time that another market participant intends to execute a trade, and then establishes a position that will benefit from the move in the market caused by the anticipated trade.  This causes the market price to move against the other market participant, benefitting the dealer who engaged in "trading ahead."  Accordingly, no one Defendant would share confidential order information because an opportunistic trader at a rival dealer could capitalize on the information to the detriment of the sharing Defendant.

144.   *Sixth*, Gilt Bonds traders operate in a tightly knit community.  Many traders have worked at multiple dealer banks during their careers and have had repetitive dealings with each other, as Gilt Bond auctions were held frequently.  These traders' friendships and networks with

other dealer traders extended beyond the office and into their respective personal lives and led them to view each other as collaborators instead of competitors.

145.    Throughout the year, the DMO encourages GEMMs to host and attend conferences, forums, and subject matters relating to Gilt Bond Markets as a means of promoting Gilt Bonds.[30] Defendants' high-ranking Gilt Bond sales and trading personnel regularly met in person at these conferences, meetings, and other events.  These meetings provided another forum for Defendants' Gilt Bond trading and sales personnel to establish closer relationships while discussing sensitive subjects such as Gilt Bond pricing.

146.    ***Seventh***, there was a high level of communication among Defendants.  As the CMA found in its May 24, 2023 press release, Defendants' traders routinely exchanged commercially sensitive information and coordinated their pricing and trading strategies through electronic platforms.   As previously discussed, traders' exchange of confidential information in online chatrooms is unnecessary for the purposes of making markets and is contrary to their individual self-interests.   There are significant concerns associated with direct communications between competitors of the sort identified.  Indeed, in response to the scandals involving anticompetitive conduct in the European government bond, LIBOR, and foreign exchange markets (among others), many financial institutions have prohibited their employees and traders from participating in multi-dealer chatrooms.

147.    Defendants also failed to monitor these trader communications, though they had the means to do so.  These oversight failures allowed employees in Defendants' Gilt Bonds trading

---

[30]    *GEMM Guidebook: A guide to the roles of the DMO and Primary Dealers in the UK government bond market* UK KINGDOM DEBT MANAGEMENT OFFICE (Mar. 16, 2016), https://www.dmo.gov.uk/media/ye2psdx3/ guidebook160316.pdf.

and sales businesses to fix prices, share sensitive customer information, and coordinate trading strategies throughout the Class Period.

148. **Eighth,** the yield curves for Gilt Bonds were lower (and therefore prices were higher) during the Class Period when compared to years preceding the formation of the Defendants cartel. *See* Figure 6 below.

**Figure 6 – Average Yield Curve for Gilt Bonds from 2007-2013**

| Year | Average Conventional Gilt Yield Curve | Average Index-linked Gilt Yield Curve |
|------|---------------------------------------|---------------------------------------|
| 2007 | 4.92% | 1.67% |
| 2008 | 4.14% | 1.17% |
| 2009 | 3.14% | 0.81% |
| 2010 | 2.87% | 0.19% |
| 2011 | 2.46% | -0.09% |
| 2012 | 1.74% | -0.50% |
| 2013 | 2.01% | -0.44% |

149. While the yield curves and prices of Gilt Bonds are subject to other economic factors, Defendants' cartel comprised a quarter of the total banks designated as GEMMs with significant influence and control over the prices of Gilt Bonds. Defendants possessed enough market power to inflate the prices of Gilt Bonds above what their true value would be, and was, in a competitive market.

**SIMILAR WRONGDOING IN OTHER MARKETS SUPPORTS
THE PLAUSIBILITY OF DEFENDANTS'
MANIPULATION OF GILT BONDS**

150. Defendants and their co-conspirators engaged in multiple similar price-fixing conspiracies in various financial markets during the Class Period, which led government investigators to find parallel deficiencies in oversight and control within Defendants' and their co-

conspirators' trading and sales businesses.  These ongoing investigations have resulted in criminal trials and convictions, billions of dollars in fines, and successful litigation by injured investors.

151.    These findings further support the conspiracy alleged in this Complaint because they demonstrate that Defendants had deficient compliance and oversight systems in their sales and trading businesses during the Class Period.

152.    **European Government Bonds**: On May 5, 2021, the Commission released its provisional, 248-page non-confidential decision following an extensive investigation detailing a multi-year conspiracy among major commercial banks – including Bank of America, NatWest (formerly RBS), Natixis, Nomura, UBS, UniCredit, and WestLB – in which traders at these banks exchanged commercially sensitive information and coordinated trading and bidding strategies in the primary and secondary markets for European Government Bonds in violation of European competition laws.

153.    Among the types of commercially-sensitive information exchanged by traders included "pricing elements, positions and/or volumes and strategies for specific counterparties related to individual trades of [European Government Bonds] on the secondary market."[31] Specifically, bank traders exchanged information concerning:

> [p]rices/spreads, deal volumes, customer details and orders for the EGB recently traded at or being offered and details of respective competitor trading positions and trading strategies in light of these positions.  Such exchanges on the prices/spreads (including mid-prices), deal volumes, customer details and orders of [European Government Bonds] which are quoted on [dealer-to-dealer] and [dealer-to-customer] platforms, informed the banks about their competitors' trading strategies and enabled them to adjust their positions and strategy in light of the information exchanged and/or respect each other's positions and strategy.[32]

---

[31]     European Commission, *CASE AT.40324 – European Government Bonds, Commission Decision* (May 20, 2021), https://ec.europa.eu/competition/antitrust/cases1/202142/AT_40324_7971056_3662 _3.pdf.

[32]     *Id.*, ¶543. (footnote omitted).

154.    These traders effectuated their conspiracy primarily through the use of multi-dealer chatrooms.  However, the conversations were often facilitated through other means, including direct telephone communications.

155.    In its May 2021 decision, the Commission identified hundreds of communications reflecting traders' exchange of commercially sensitive information, coordination of bidding strategies, and attempts to fix, rig, and/or manipulate the prices of European Government Bonds in the primary and secondary markets.  As the Commission observed:

> Through their contacts, . . . the participating banks coordinated their conduct in EGB and ***directly or indirectly fixed purchase or selling prices, altered the normal trading conditions of the market and shared the market*** (such as when exchanging confidential information about specific counterparties, as well as information on volumes in order to obtain the desired allocation at auctions).[33]

156.    The Commission imposed fines exceeding $450 million against Nomura, UBS, and UniCredit, for their participation in the cartel.  Fines would have exceeded $900 million, had certain entities not received credit for their cooperation in the investigation.

157.    Private litigation against these cartel members, which includes banks not subject to the Commission's investigation (such as Citigroup), is currently underway in the United States District Court for the Southern District of New York.  On March 14, 2022, that court denied the motion of Citigroup Global Markets Limited and Citigroup Global Markets Inc. to dismiss the case as alleged against them, concluding plaintiffs had alleged sufficient factual matter to tie these entities to the conspiracy.  *See, In re Eur. Gov't Bonds Antitrust Litig.*, No. 19 CIV. 2601 (VM), 2022 WL 768680 (S.D.N.Y. Mar. 14, 2022), *reconsideration denied*, No. 19 CIV. 2601 (VM), 2022 WL 2168358 (S.D.N.Y. June 16, 2022).

---

[33]    *Id.*, ¶535 (emphasis added) (footnotes omitted).

158.    In addition, the Commission announced in December 2022 that it launched another investigation into Defendant DBAG, and its co-conspirator Rabobank, for their similar, collusive conduct and anticompetitive chatroom communications relating to Euro-denominated SSA, Covered, and Guaranteed bonds, as well as European Government Bonds issued by Eurozone countries from 2005 to 2016.    Indeed, the Commission granted DBAG "conditional immunity" for reporting the cartel and admitting DBAG's participation, just as the CMA has granted provisional immunity to DBAG for similar admissions in the Gilt Bond cartel alleged here.

159.    Upon information and belief, traders at DBAG and Rabobank used tactics similar to those used by the banks in the earlier investigation by the Commission, and in doing so, fixed prices of European Government Bonds purchased and sold in the secondary market.

160.    Further, the Commission's investigation against DBAG and Rabobank is "the third investigation conducted by the Commission involving cartels affecting the market for bonds trading.  In April 2021, the Commission fined three investment banks a total of € 28 million for participating in a US Dollar-denominated SSA bonds trading cartel."[34]   DBAG, the fourth investment bank found to have participated in the cartel, was not fined as it revealed the existence of the cartel to the Commission.[35]

161.    **FX**:  Multiple banks, including Defendants DBAG, HSBC, Citi, Morgan Stanley, and RBC failed to control or detect rampant misconduct amongst their trading staff in the foreign exchange ("FX") market.  These failures allowed traders to fix bid-ask spreads, coordinate trading strategies with competitors to manipulate benchmark prices, and share confidential customer order

---

[34]     *Antitrust: Commission sends Statement of Objections to Deutsche Bank and Rabobank over Euro-denominated bonds trading cartel case*, EUROPEAN COMMISSION (Dec. 2, 2022), https://ec.europa.eu/commission/presscorner/detail/en/ip_22_7409.

[35]     *Antitrust: Commission fines investment banks €28 million for participating in SSA bonds trading cartel*, EUROPEAN COMMISSION (Apr. 28, 2021), https://ec.europa.eu/commission/presscorner/detail/en/ip_21_2004.

information and proprietary information on trading positions with competitors in group chatrooms with names like "The Cartel."  Deficient oversight and controls allowed this anticompetitive conduct to persist undetected for years during the Class Period.

162.    On November 11, 2014, the Commodities Futures Trading Commission ("CFTC") fined Citi and HSBC, among other banks, for attempted acts of commodities manipulation in violation of the Commodities Exchange Act and related regulations as a result of their misconduct. The CFTC found that these banks' weak internal controls and supervisory failures allowed FX traders to carry out their manipulation through chatroom communications.

163.    That same day, the UK Financial Conduct Authority ("FCA") fined Citi and HSBC, among other banks, for failing to properly identify, assess, and manage London-based voice trading operations in the G10 spot FX market, which permitted collusive conduct occurring in online chatrooms.

164.    Also on November 11, 2014, the OCC fined Citi, among other banks, for their traders' use of electronic messaging platforms to discuss engaging in FX-related misconduct, including to coordinate trading strategies, trigger customer limit orders, trade ahead of customer orders, and share confidential bank information.

165.    On May 20, 2015, Citi, among other banks, pleaded guilty to criminal antitrust charges under Section 1 of the Sherman Act as a result of the scheme.  Its admitted conduct includes FX traders using chatrooms on a near-daily basis to discuss coordinated trading and refraining from certain trading behavior that would negatively impact co-conspirators.  The US Federal Reserve also fined Citi, among others, for lack of adequate governance, risk management, compliance, and internal policies and procedures that permitted the FX traders to use chatrooms to communicate with other institutions regarding coordinated trading positions and strategies, as

well as shared confidential information.  In 2017, the Federal Reserve fined DBAG and HSBC for engaging in similar conduct.

166.    Deutsche Bank AG entered into a Consent Order with the New York State Department of Financial Services ("DFS") regarding its anticompetitive conduct in the FX market. Deutsche Bank AG agreed to pay a fine of $205 million as part of the Consent Order with the DFS for violations of law, including efforts to improperly coordinate trading activity through online chatrooms, improperly sharing confidential customer information, trading aggressively to skew prices, and misleading customers.

167.    The DFS determined that from 2007 to 2013, when Deutsche Bank was the largest foreign exchange dealer in the world, Deutsche Bank repeatedly engaged in improper, unsafe, and unsound conduct in its foreign exchange business due to its failures to implement effective controls.

168.    The DFS investigation found that Deutsche Bank foreign exchange traders participated in multi-party online chatrooms where participants shared confidential information, discussed coordinating trading activity, and attempted to manipulate foreign exchange currency prices or benchmark rates.  By engaging in these activities, these traders sought to diminish competition and increase their profits by executing foreign exchange trades at the expense of customers or the wider market.

169.    The DFS investigation also discovered that certain Deutsche Bank employees sought to manipulate submission-based benchmarks for certain currency pairs.  The benchmarks, supposedly derived from an objective submission process, instead became potentially tainted when traders sought submissions premised on benefitting their own particular trading positions.  In addition, on numerous occasions, certain Deutsche Bank traders and salespeople improperly

swapped customer identity and order information with competitors at other banks.   With information about the prices competitors were quoting, traders could collude to maximize their profits at customers' expense.

170.   Deutsche Bank sales staff also engaged in other improper conduct designed to benefit the bank by shortchanging customers, including "deliberate underfills" and tactics designed to secretly increase the "markup" charged to customers for trade execution.   In numerous instances, Deutsche Bank staff intentionally failed to correct, or even intentionally made, errors or misleading entries in trade execution records to keep extra profit for themselves and the bank.

171.   In 2018, Citi, DBAG, HSBC, Morgan Stanley, and RBC, along with their co-conspirators, agreed to pay billions of dollars to settle private antitrust claims arising from the misconduct.   Specifically, Citi agreed to pay $384 million; DBAG agreed to pay $190 million; HSBC agreed to pay $285 million; Morgan Stanley agreed to pay $50 million; and RBC agreed to pay $15.5 million.

172.   **LIBOR/Euribor/Yen LIBOR/Swiss Franc LIBOR**:   Government investigations and civil lawsuits revealed widespread collusion among banks to manipulate benchmark interest rates for multiple currencies (US dollar LIBOR, Euribor, Yen LIBOR, and Swiss franc LIBOR) during the Class Period.   These investigations have led to dozens of fines and settlements for price-fixing by banks, including Deutsche Bank and Citigroup.   Regulators found that trading staff within the colluding banks engaged in widespread misconduct during the Class Period, including coordinating false submissions by panelists to the benchmark-setting panel, sharing customer and order information, and manipulating market prices by submitting false orders (*i.e.*, "spoofing").

173.   LIBOR-rigging probes ended in approximately $9 billion of fines worldwide for banks, including $2.5 billion for Deutsche Bank, accused of fixing the benchmark to boost profit.

Citigroup pleaded guilty to felony antitrust charges and agreed to pay $925 million in fines to US authorities.

174. **ISDAfix**:  The CFTC issued an Order filing and settling charges against DBSI for attempted manipulation of the International Swaps and Derivatives Association Fix ("ISDAfix") benchmark and requiring DBSI to pay a $70 million civil monetary penalty.  The CFTC Order found that over a five-year period, beginning in at least January 2007, and continuing through May 2012, DBSI made false reports and, through the acts of multiple traders, attempted to manipulate the US Dollar ISDAfix, a leading global benchmark referenced in a range of interest rate products, to benefit its derivatives positions, including positions involving cash-settled options on interest rate swaps.

175. **USD-denominated SSA Bonds**:  A US Department of Justice investigation into price-fixing in the US dollar-denominated SSA bond market became public in December 2015. The European Commission's investigation in this case started in August 2015 with an application under the Commission's 2006 Leniency Notice submitted by Deutsche Bank.[36]  It quickly prompted the filing of private lawsuits.  The private civil action, originally filed in May 2016, was amended in April 2017, to include 10 banks and hundreds of redacted chats and transcripts that demonstrated that these banks failed to detect and deter collusive communications by trading and sales staff in their bond businesses.  In 2017, Deutsche Bank AG agreed to settle for a total of $48.5 million.  Had Deutsche Bank not obtained immunity in the European Commission investigation, it would have been fined €21.5 million.

176. **Mexican Government Bonds**: The Mexican antitrust regulator, the Comisión Federal de Competencia Económica ("COFECE"), imposed fines totaling 35 million pesos ($1.75

---

[36]  European Commission, Press Release, *Competition: Commission adopts revised Leniency Notice to reward companies that report cartels* (Dec. 7, 2006), https://ec.europa.eu/commission/presscorner/detail/en/IP_06_1705

million) on seven international banks and traders for market manipulation and collusion in the government bond market.  COFECE said the banks, including Deutsche Bank and Citigroup (through its subsidiary Citibanamex), agreed to sell or buy bonds at a certain price or to not trade them at all, and these agreements "'had a direct impact on the price of the related instruments.'"[37]

## CLASS ACTION ALLEGATIONS

177.    Plaintiff brings this action on behalf of themselves and as a class action under Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, seeking relief on behalf of the following Class (the "Class"):

> All persons or entities who purchased or sold Gilt Bonds in the United States directly from Defendants from at least as early as January 1, 2009, through at least December 31, 2013 (the "Class Period").

> Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the United States Government.

178.    Plaintiff believes that there are thousands of Class Members, making the Class so numerous and geographically dispersed that joinder of all Class Members is impracticable.

179.    There are questions of law and fact common to the Class that relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

(a)    whether Defendants engaged in a combination or conspiracy to fix, raise, maintain, stabilize, or otherwise manipulate the prices for Gilt Bonds in violation of the Sherman Act;

(b)    the identity of the participants in the conspiracy;

---

[37]    Abraham Gonzalez, *CORRECTED – Mexican watchdog fines seven international banks for bond rigging*, REUTERS (Jan. 25, 2021), https://www.reuters.com/article/me.xico-banks/corrected-mexican-watchdog-fines-seven-international-banks-for-bond-rigging-idUSL1N2K01J0.

(c)      the duration of the conspiracy;

(d)      the nature and character of the acts performed by Defendants in furtherance of the conspiracy;

(e)      whether Defendants' conduct, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the Class;

(f)      whether Defendants fraudulently concealed the conspiracy's existence from Plaintiffs and the Class; and

(g)      the appropriate measure of damages sustained by Plaintiffs and the Class.

180.    Plaintiff's claims are typical of the claims of the other Class Members.  Plaintiff and Class Members sustained damages arising out of Defendants' common course of conduct in violation of the law as described in this Complaint.  The injuries and damages of each Class Member were directly caused by Defendants' wrongful conduct.

181.    Plaintiff will fairly and adequately protect the interests of Class Members.  Plaintiff is an adequate representative of the Class and has no interests adverse to the interests of absent Class Members.  Plaintiff has retained counsel competent and experienced in class action litigation, including antitrust class action litigation.

182.    The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications.

183.    The questions of law and fact common to the Class Members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

184.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without duplication of effort and expense that numerous, separate individual actions, or repetitive litigation would entail.  The Class is readily definable and is one for which records should exist in the files of Defendants, Class Members, or the public record.  Class treatment will also permit the adjudication of relatively small claims by many Class Members who otherwise could not afford to litigate the claims alleged herein, including those for antitrust.  This class action presents no difficulties of management that would preclude its maintenance as a class action.

## DEFENDANTS FRAUDULENTLY CONCEALED THEIR MISCONDUCT

185.    Defendants concealed their wrongdoing in manipulating the prices of Gilt Bonds sold to investors.  Thus, the statutes of limitations relating to the claim for relief alleged below were tolled due both to Defendants' affirmative acts of concealment and the inherently self-concealing nature of their private unregulated conduct.

186.    Defendants' success in concealing their collusion was facilitated by their tremendous control over the market for Gilt Bonds.

187.    Neither Plaintiff nor Class Members knew of Defendants' unlawful and self-concealing manipulative acts and could not have discovered them by the exercise of reasonable due diligence, if at all, at least prior to public reports disclosing the CMA's Statement of Objections concerning Gilt Bonds.  Plaintiff and the Class also lacked any basis for identifying the wrongdoers or calculating damages before that date.  In fact, Defendants' collusive activities were so well-hidden that regulators in Europe and elsewhere were unaware of such conduct for over a decade.

188.     Only after the CMA publicly announced its preliminary findings of price collusion in the Gilt Bonds market against the Defendants, on May 24, 2023, did Plaintiff have a sufficient basis to investigate Defendants' possible collusion.  Even now, most details of the CMA's proceedings remain confidential and undisclosed.

189.     Reasonable due diligence could not have uncovered the conspiracy because: (i) Defendants' trading positions and trading strategies in the Gilt Bonds Market are not publicly available; (ii) the bilateral, non-exchange traded nature of Gilt Bond transactions make observing anticompetitive behavior in that market exceedingly difficult; (iii) the highly specialized and esoteric nature of the different aspects of the Gilt Bonds market makes it exceedingly difficult for an ordinary person to assess improprieties; (iv) neither Defendants nor their co-conspirators told Plaintiff or other Class Members that they were conspiring to fix, stabilize, maintain, and/or otherwise manipulate the prices of Gilt Bonds; and (v) Plaintiff and members of the Class were not parties to Defendants' and their co-conspirators' communications in private chatrooms, in which they agreed to fix the prices of Gilt Bonds.

190.     Deutsche Bank's acceptance into the CMA's leniency program after disclosing the existence of the cartel to the CMA and confessing to their participation further demonstrates that the conspiracy alleged in this Complaint operated in secret and had remained a secret for a decade.

191.     Defendants also took active steps to conceal evidence of their misconduct from Plaintiff, the Class, government regulators, and the public by holding out their activities in the Gilt Bonds Market as good-faith market-making conduct.  Defendants concealed their conduct by maintaining the secrecy of their price-fixing scheme and avoiding any discussion in public fora regarding their collusive activities and manipulation of Gilt Bond prices.  Upon information and belief, this included, among other things, the use of non-public proprietary electronic

communication platforms (*e.g.*, instant messaging, electronic chatrooms, etc.) to coordinate trading strategies using code words and instructions to keep certain discussions private or to refrain from memorializing in writing any incriminating discussions.  Further, each Defendant's code of conduct represented that its operations were above board, providing a false sense of security to unwitting investors:

(a)     ***Deutsche Bank***.  Deutsche Bank's Code of Conduct and Ethics states that "it sets the minimum standard for ethical business conduct for employees of Deutsche Bank Group.  These standards govern employee interactions with our customers, competitors, business partners, governmental authorities, and shareholders, as well as with each other."  The Code of Conduct and Ethics further state that "[w]e conduct our business in accordance with applicable antitrust laws that are designed to advance fair competition and prohibit the misuse of market power by individual companies."[38]

(b)     ***Citigroup***.  Citigroup's Code of Conduct states that "Citi is subject to complex laws designed to preserve competition among enterprises and to protect consumers from unfair business arrangements and practices."  Employees "are expected to be aware of and comply with these laws at all times."  Among the "unlawful anticompetitive activities" that Citigroup employees should avoid, include: (1) "Proposals from competitors to share price or other competitive marketing information or to allocate markets or clients," (2) "Attempts by clients or potential clients to preclude Citi from doing business with, or contracting with, another client,"

---

[38]     *Code of Business Conduct and Ethics for Deutsche Bank Group* (April 2010), at 2, 5, DEUTSCHE BANK, https://thefinancialbrand.com/wp-content/uploads/2011/04/Deutsche_Bank_Code_of_Business_Conduct_and_Ethics_English.pdf.

and (3) "Discussions at industry trade association meetings on competitively sensitive topics, such as prices, pricing policies, costs and marketing strategies."[39]

   (c) **RBC**. RBC's Code of Conduct states each employee "has a responsibility to know and comply with applicable competition and anti-trust laws."  The Code of Conduct prohibits any agreement with a competitor to either direct or indirectly (1) "fix, maintain, increase or try to control the price of a product or service," (2) "divide or allocate sales, clients, suppliers or markets for the supply, or acquisition of, products or services," or (3) "fix, maintain, increase, lessen, prevent, eliminate or otherwise try to control the production or supply of a product or service."[40]  An October 2010 version of RBC's Code of Conduct similarly demands that employees are to "avoid any collusive, anti-competitive discussions and/or agreements with competitors."[41]

   (d) **HSBC**. HSBC's Code of Conduct promises to provide products and services that "do not undermine market competition."[42]  The Code demands that employees "never take unfair advantage of anyone through manipulation, concealment, abuse of confidential information, misrepresentation of material facts, or any unfair-dealing practice."[43]  In regards to HSBC's sales practices, the Code warns that "[n]o one should knowingly participate in actions,

---

[39] *Code of Conduct* (2011), at 8, CITIGROUP, https://web.archive.org/web/20121021071221/ https://www.citigroup.com/citi/investor/data/codeconduct_en.pdf.

[40] *Code of Conduct* (2021), at 14, ROYAL BANK OF CANADA, https://www.rbc.com/our-company/_assets-custom/pdf/Code-Of-Conduct.pdf (last visited May 31, 2023).

[41] *Code of Conduct* (Oct. 1, 2010), at 12, ROYAL BANK OF CANADA, http://web.archive.org/web/ 20110626014229/http://www.rbc.com/governance/_assets-custom/pdf/RBCCodeOfConduct.pdf.

[42] *Statement of Business Principles and Code of Conduct*, HSBC HOLDINGS PLC, https://www.hsbc.com/- /files/hsbc/our-approach/risk-and-responsibility/pdfs/211207-statement-of-business-principles-and-code-of- conduct.pdf?download=1#:~:text=HSBC%20requires%20our%20Directors%20and,these%20as%20a%20disciplina ry%20matter (last visited May 31, 2023).

[43] *Id.*

agreements, or policies or practices that may be detrimental to customers, competitors or the community."[44]

        (e)    ***Morgan Stanley***.  According to Morgan Stanley's Code of Conduct, "Morgan Stanley is committed to promoting free, fair and competitive markets [and] will not tolerate any attempts by an employee or representative of Morgan Stanley to manipulate the markets or the prices of securities or impede fair competition."[45]  Specifically, Morgan Stanley warns employees that "colluding with others to distort the price or liquidity of a product or manipulating a financial benchmark" violates antitrust and competition laws and to "[n]ever agree with a competitor to fix prices or otherwise distort the market."[46]

192.    Defendants failed to implement proper internal controls to detect misconduct concerning price-fixing of Gilt Bonds.  Such internal failures made it more difficult for Plaintiff, the Class, government regulators, and the public to discover Defendants' misconduct.

193.    As a result of Defendants' affirmative steps to conceal their improper conduct; their willful decision not to implement proper controls to detect improper conduct; the self-concealing nature of the price-fixing conspiracy; and, the resulting lack of public information about the entities and the material aspects of the conspiracy, collusion, and trading based on nonpublic information, the statutes of limitations were tolled for Plaintiff's and the Class's claims.

### VIOLATION OF 15 U.S.C. §1
### CONTRACT, COMBINATION, OR CONSPIRACY IN RESTRAINT OF TRADE

194.    Plaintiff incorporates the preceding paragraphs by reference.

---

[44]    *Id.*

[45]    *Code of Conduct: A Message from James Gorman to Employees*, MORGAN STANLEY, https://www.morganstanley.com/about-us-governance/code-of-conduct (last visited May 31, 2023).

[46]    *Id.*

195.     Defendants entered into, and engaged in, a combination and conspiracy that was an unreasonable and unlawful restraint of trade in violation of §1 of the Sherman Act, 15 U.S.C. §§1, *et seq.* ("Sherman Act").

196.     During the Class Period, Defendants entered into an agreement to reduce competition among themselves by fixing and manipulating the prices of Gilt Bonds sold in the United States.

197.     This conspiracy to manipulate Gilt Bonds prices caused injury to both Plaintiff and the Class by depriving them of the benefit of competitive Gilt Bonds prices reflecting true market fundamentals for some period during and following Defendants' unlawful conduct, and thus, Plaintiff and the Class received, upon execution of their trades, less in value than they would have received absent Defendants' wrongful conduct.

198.     The conspiracy is a *per se* violation of §1 of the Sherman Act.  Alternatively, the conspiracy resulted in substantial anticompetitive effects in the Gilt Bonds Market.  There is no legitimate business justification for, nor pro-competitive benefits from, Defendants' conduct. Furthermore, any business justification is outweighed by the anticompetitive effects of their illegal conduct.

199.     As a direct and proximate result of Defendants' violation of §1 of the Sherman Act, Plaintiff and the Class have been injured in their business and property throughout the Class Period.

200.     Plaintiff and the Class are entitled to treble damages for the violations of the Sherman Act alleged in this Complaint.

## **RELIEF REQUESTED**

Accordingly, Plaintiff demands relief as follows:

(A)     That the Court certifies this lawsuit as a class action under Federal Rule of Civil Procedure 23(a) and (b)(3), that Plaintiff be designated as Class Representatives, that Plaintiff's

counsel be appointed as counsel for the Class, and that the Court directs that reasonable notice of this action, as provided by Federal Rule of Civil Procedure 23(c)(2), be given to each and every member of the Class;

(B)     That the unlawful conduct alleged in the Complaint be adjudged and decreed to violate §1 of the Sherman Act;

(C)     That the Court award Plaintiff and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest at the highest legal rate;

(D)     That the Court award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

(E)     That the Court directs such further relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a jury trial as to all issues triable by a jury.

Dated: June 16, 2023                **SCOTT+SCOTT ATTORNEYS AT LAW LLP**

_s/ Patrick Coughlin_
PATRICK COUGHLIN
CARMEN MEDICI (*pro hac vice forthcoming*)
FATIMA BRIZUELA
DANIEL J. BROCKWELL (*pro hac vice forthcoming*)
JOHN SMALLWOOD (*pro hac vice forthcoming*)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
pcoughlin@scott-sc ott.com
cmedici@scott-scott.com
fbrizuela@scott-scott.com
dbrockwell@scott-scott.com
jsmallwood@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
KRISTEN M. ANDERSON
DONALD A. BROGGI
MICHELLE E. CONSTON
PATRICK J. RODRIGUEZ
The Helmsley Building
230 Park Ave., 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
kanderson@scott-scott.com
dbroggi@scott-scott.com
mconston@scott-scott.com
prodriguez@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
DAVID R. SCOTT
AMANDA LAWRENCE
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: 860-537-5537
Facsimile:  860-537-4432
david.scott@scott-scott.com
alawrence@scott-scott.com

*Counsel for Plaintiff Oklahoma Firefighters
Pension and Retirement System, and Proposed
Class Counsel*