+ **Via ECF** +

August 21, 2023

Honorable John G. Koeltl
United States District Court, Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007-1312

Re: <u>Okla. Firefighters Pension and Ret. Sys. v. Deutsche Bank AG, et al.</u>, No. 1:23-cv-05095

Dear Judge Koeltl:

Pursuant to the Court's order dated August 15, 2023 (ECF No. 52), Plaintiff writes in response to Defendants' letter (ECF No. 51; "Letter" or "Ltr.")[1] for a pre-motion conference regarding their anticipated motions to dismiss Plaintiff's CAC (ECF No. 1).[2] The CAC adequately alleges a plausible conspiracy in violation of Section 1 of the Sheman Act (15 U.S.C. §1), antitrust injury, fraudulent concealment, and multiple bases for personal jurisdiction over the Foreign Defendants. Accordingly, the purported reasons for dismissal raised in the Letter lack merit.

***Plaintiff plausibly alleges that Defendants participated in a conspiracy to fix and otherwise manipulate the price of Gilts.*** This case concerns a *per se* unlawful conspiracy by Defendants to fix Gilt bid-ask spreads, orchestrated primarily through non-public, invitation-only, interbank electronic chatrooms. ¶¶4, 7-8, 107, 111-16. Specifically, the CAC alleges that between 2009 and 2013, Defendants, a group of Gilt primary dealer banks or "GEMMs," secretly exchanged commercially and competitively sensitive information, including "details on pricing and other aspects of their trading strategies," such as auction allocations, customer quotes and orders, and the prices of executed trades. ¶¶5-6, 16, 85, 107, 110-13, 118. In a competitive market, such behavior is against economic self-interest, as it informs rivals of market demand and offering strategies, resulting in substantial trading losses for the disclosing bank to its more knowledgeable competitors. ¶¶4, 98, 108-09. As a conspiracy, however, this conduct permitted Defendants to manipulate the price and allocation of bonds in the primary market and coordinate the bid-ask prices they offered, either directly or through respective affiliates, to secondary-market customers located in the United States. ¶¶5, 6, 9, 15, 25, 98, 112-13, 196.

Plaintiff supports these allegations with direct and circumstantial evidence of the conspiracy. As Plaintiff alleges, the United Kingdom's CMA provisionally found that each of these banks violated Chapter 1 of the United Kingdom Competition Act – the equivalent of Section 1 of the Sherman Act – prohibiting, *inter alia*, "agreements" to "directly or indirectly fix purchase or selling prices or any other trading conditions." Competition Act 1998, c. 1 (UK); *see* ¶¶117-21. *Starr v. Sony BMG Music Ent.*, 592 F.3d 314, 324 (2d Cir. 2010) (alleged regulatory investigations into defendants' price-fixing support the inference of conspiracy). Defendants overlook that Deutsche Bank and Citigroup have ***admitted*** their participation in the anticompetitive conduct as part of their respective entrances into the CMA's leniency program. ¶¶8, 129-32; *see, e.g.*, *Nastasi & Assocs., Inc. v. Bloomberg, L.P.*, No. 20-CV-5428 (JMF), 2022 WL 4448621, at *12 (S.D.N.Y. Sept. 23,

---

[1] Defendants are Deutsche Bank Aktiengesellschaft (f/k/a Deutsche Bank AG) ("DBAG") and Deutsche Bank Securities Inc. ("DBSI"; together, "Deutsche Bank"); Citigroup Global Markets Limited ("CGML") and Citigroup Global Markets Inc. ("CGMI"; together, "Citigroup"); RBC Europe Limited ("RBC Europe") and RBC Capital Markets LLC ("RBC Capital Markets"); HSBC Bank plc ("HSBC Bank") and HSBC Securities (USA) Inc. ("HSBC Securities"; together, "HSBC"), and Morgan Stanley & Co International Plc and Morgan Stanley & Co. LLC. "United States-based Defendants" refers to DBSI, CGMI, RBC Capital Markets, HSBC Securities, and Morgan Stanley & Co. LLC. "Foreign Defendants" refers to DBAG, CGML, RBC Europe, HSBC Bank, and Morgan Stanley & Co International Plc.

[2] Unless indicated otherwise, capitalized terms have the same meanings defined in Defendants' Letter. Pilcrows ("¶" or "¶¶") cite to paragraphs of the CAC, and unless otherwise indicated, citations are omitted and emphasis is added.

2022) (finding that guilty pleas support the inference of conspiracy). Defendants' purported distinction (Ltr. at 3) that the CMA investigation concerns "analytically distinct" information exchange is undermined by their own cited authority: "Information exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement." *Todd v. Exxon Corp.*, 275 F.3d 191, 198 (2d Cir. 2001); *see also In re Foreign Exch. Benchmark Rates Antitrust Litig.*, No. 13 CIV. 7789 (LGS), 2016 WL 5108131, at *4 (S.D.N.Y. Sept. 20, 2016) ("the sharing of information between competitors constitutes circumstantial evidence of an antitrust conspiracy and is sufficient at the pleading stage"). In any event, "[t]he presence of an ongoing investigation into the *same subject matter* as alleged in the pleadings here raises an inference of conspiracy." *In re Propranolol Antitrust Litig.*, 249 F. Supp. 3d 712, 723 (S.D.N.Y. 2017).

Beyond the fact that CMA is investigating Defendants, the CAC contains additional non-speculative allegations that "'evince a common motive to conspire' combined with 'a high number of interfirm communications,'" which the Second Circuit has reiterated are "adequate to plead a conspiracy." *In re Platinum & Palladium Antitrust Litig.*, 61 F.4th 242, 270 (2d Cir. 2023); ¶¶5, 107-16, 133-49. Indeed, Plaintiff alleges that Deutsche Bank "operated as the information hub for coordination between Defendants," in which Deutsche Bank would communicate with each of the other banks "frequently" to collect and disseminate confidential information to its co-conspirators through unilateral chat rooms. ¶¶113-14; *see also In re Foreign Exch. Benchmark Rates Antitrust Litig.*, 74 F. Supp. 3d 581, 591 (S.D.N.Y. 2015) (conspiracy adequately pleaded based on, among other assertions, "traders from the Defendant banks us[ing] various electronic communications platforms, particularly chat rooms and instant messaging, to share 'market sensitive information with rivals'"). Defendants' contention that Plaintiff must include statistical analyses demonstrating how each Defendant participated is a red herring. Ltr. at 2. Separate and independent of Plaintiff's chart (¶148), which demonstrates motive to collude, Plaintiff alleges a plausible conspiracy and adequate ties to the conspiracy for each Defendant, including the broker-dealer entities (*i.e.*, the United States-based Defendants) by nature of their agency relationship with the GEMM entities (*i.e.*, the Foreign Defendants). Specifically, in each Defendant banking family, the GEMM was responsible for acquiring, pricing, and distributing Gilts to the United States, either to customers directly or through their domestic affiliate. ¶¶3, 24-26, 29-73, 93-96, 99-102. Because the affiliates "work together in the primary and secondary" Gilt markets, the Court may infer the United States-based Defendants' "involvement in the alleged conspiracy." *In re Eur. Gov't Bonds Antitrust Litig.*, No. 19 CIV. 2601 (VM), 2022 WL 768680, at *23 (S.D.N.Y. Mar. 14, 2022) ("*EGB II*").

***Plaintiff adequately alleges an antitrust injury***. A plaintiff who alleges injury "in the very market that the defendants restrained" has antitrust standing. *Eastman Kodak Co. v. Henry Bath LLC*, 936 F.3d 86, 95 (2d Cir. 2019). By alleging that because of the conspiracy, Plaintiff transacted Gilts at artificially fixed prices that "no longer reflect ordinary market conditions," Plaintiff has established antitrust injury. *Gelboim v. Bank of Am. Corp.*, 823 F.3d 759, 776 (2d Cir. 2016); ¶¶9, 28, 107-16, 196-97. Courts have repeatedly rejected the claim (Ltr. at 3) that Plaintiff must plead it was injured in a specific Gilt transaction with a named Defendant. *See In re Eur. Gov't Bonds Antitrust Litig.*, No. 19 Civ. 2601 (VM), 2020 WL 4273811, at *13 (S.D.N.Y. July 23, 2020) ("*EGB I*"); *In re GSE Bonds Antitrust Litig.*, 396 F. Supp. 3d 354, 366-67 (S.D.N.Y. 2019) ("*GSE Bonds*").[3]

***Plaintiff's claim is timely***. Plaintiff's Sherman Act claim is timely because it was filed within four years of the CMA's May 24, 2023 announcement of the issuance of a Statement of Objections against Defendants. ¶¶7-8, 187-88. Defendants fraudulently concealed their conspiracy, tolling the applicable limitations period. ¶¶6, 185-93; *see also State of N.Y. v. Hendrickson Bros.*,

---

[3] Defendants' reliance on *In re SSA Bonds Antitrust Litig.*, No. 16-cv-3711, 2019 WL 49171608 (S.D.N.Y. Oct. 4, 2019), is misplaced. There, by requiring plaintiffs to plead the specific transactions that defendants price fixed, the court imposed a pleading standard not required in the Second Circuit. *See EGB I*, 2020 WL 4273811, at *13. Likewise, *Harry v. Total Gas & Power N. Am., Inc.*, 889 F.3d 104, 116 (2d Cir. 2018), did not state that specific transactions must be pleaded in every antitrust case. Instead, it required the pleading of specific transactions under the circumstances presented in that case because the plaintiffs did not purchase financial instruments with prices tied to the regional hubs where the anticompetitive practices allegedly occurred, but instead alleged that the anticompetitive practices at those hubs indirectly affected the competitive conditions of the hub the plaintiffs actually frequented. *See id.* at 413-14.

840 F.2d 1065, 1083 (2d Cir. 1988); *EGB I*, 2020 WL 4273811, at *10. Courts have consistently recognized that price-fixing conspiracies, like the one alleged here, are inherently self-concealing. *See, e.g.*, *GSE Bonds*, 396 F. Supp. 3d at 367-68; *EGB I*, 2020 WL 4273811, at *10. Plaintiff also alleges that Defendants frustrated efforts to uncover their conduct by conspiring in private chat rooms (¶¶5-6, 189, 191), *see Dennis v. JPMorgan Chase & Co.*, 343 F. Supp. 3d 122, 195 (S.D.N.Y. 2018), falsely representing that they complied with applicable competition laws (¶191), *see In re Signet Jewelers Ltd. Sec. Litig.*, 389 F. Supp. 3d 221, 231 (S.D.N.Y. 2019), and making affirmative statements in their codes of conduct that consistently disavowed that they engaged in any unfair competitive practices with respect to their Gilt bond trading (¶191). *EGB II*, 2022 WL 768680, at *13. Accordingly, despite its diligence, Plaintiff was unaware of, and unable to discover, Defendants' scheme until May 2023.[4] Defendants incorrectly argue that a single November 2018 news article,[5] which is outside the pleadings and cannot be considered on this motion (*see DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)), put Plaintiff on inquiry notice of the cartel in November 2018. *See* Ltr. at 3. This article lacks any detail necessary to put investors on inquiry notice of their claims – it does not name the banks under investigation by the CMA (it only speculates about "banks with a major presence in London's bond markets"), the instruments at issue, or even what type of market manipulation may have occurred. *See, e.g.*, *Sullivan v. Barclays PLC*, No. 13-CV-2811 (PKC), 2017 WL 685570, at *28 (S.D.N.Y. Feb. 21, 2017) (rejecting defendants' argument that "October 2011 press reports about possible Euribor manipulation should have alerted plaintiffs to their claims" because "those early reports did not provide plaintiffs with information sufficient to identify each defendant or a good-faith basis to allege a cognizable theory of liability"); *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC*, 366 F. Supp. 3d 516, 530 (S.D.N.Y. 2018). In fact, the article states, "[d]etails of the CMA investigation ***remained sketchy*** this weekend, including which banks were under scrutiny" and "[i]t was unclear whether the CMA was examining banks' ability to manage potential conflicts of interest in their bond trading activities or more straightforward allegations that traders had colluded to fix prices." It was not until the CMA's May 24, 2023 announcement of its preliminary findings of collusion by the Defendants in the market for Gilt bonds that Plaintiffs were on inquiry notice of their claim.

***Plaintiff has established personal jurisdiction over the Foreign Defendants***. The CAC alleges that each primary dealer Defendant charged, sold, and collected overcharges in the United States through United States employees. ¶¶11-15, 17, 19-23, 25-26, 36-37, 44, 53, 56, 59, 65-67, 70-73, 102. Thus, the CAC provides two independent bases for personal jurisdiction over the Foreign Defendants[6] – purposeful availment and conspiracy jurisdiction. ***First***, a defendant-dealer purposefully avails itself in the forum and is, therefore, subject to specific personal jurisdiction, where it directly or indirectly transacts Gilts in the United States. *See EGB I*, 2020 WL 4273811, at *6-10; *EGB II*, 2022 WL 768680, at *7-12. Here, the Foreign Defendants marketed, priced, and sold Gilts in the United States market, including Plaintiff's trades with HSBC and Citigroup. ¶¶11-15, 18-28, 29-73, 43-44, 47, 64-67. Furthermore, there is no dispute that this conduct "relate[s] to" Plaintiff's claim (*i.e.*, the inflation and manipulation of Gilts prices). *EGB II*, 2022 WL 768680, at *9-10 (citing *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017 (2021)). ***Second***, conspiracy jurisdiction exists when: (i) a conspiracy existed; (ii) the defendant participated in the conspiracy; and (iii) a co-conspirator took overt acts in furtherance of the conspiracy in the forum. *See Charles Schwab Corp.*, 883 F.3d at 87. Defendants overtly acted in furtherance of the conspiracy in the United States by trading price-fixed Gilts here, including New York specifically. ¶¶11-15, 17, 19-26, 31-38, 40-41, 43, 51-53, 58-59, 62, 64-67, 69, 71-73, 100, 102. Therefore, Foreign Defendants are subject to the personal jurisdiction of this Court.

---

[4] As multiple courts in this District have recognized, raw price data alone in the absence of context highlighting the significance of the data does not establish inquiry notice of Defendants' conspiracy. *See, e.g.*, *GSE Bonds*, 396 F. Supp. 3d at 367-68 ("requiring potential plaintiffs to conduct exhaustive statistical analysis of millions of transactions, just on the off chance that it would reveal some suspicious behavior, would be absurd."); *EGB I*, 2020 WL 4273811, at *12; *Sullivan*, 2017 WL 685570, at *27.

[5] Defendants claim that "the CMA issued a press release," but fail to cite to anything but a sky.com article that does not mention a press release, and Defendants provide no basis as to why Plaintiff would have seen this obscure, irrelevant article. *See, e.g.*, *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 98 (2d Cir. 2018).

[6] The United States-based Defendants do not contest personal jurisdiction.

3

Respectfully submitted,

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

*s/ Patrick Coughlin*
PATRICK COUGHLIN
CARMEN MEDICI (*pro hac vice forthcoming*)
FATIMA BRIZUELA
DANIEL J. BROCKWELL (admitted *pro hac vice*)
JOHN SMALLWOOD (admitted *pro hac vice*)
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: 619-233-4565
Facsimile:  619-233-0508
pcoughlin@scott-scott.com
cmedici@scott-scott.com
fbrizuela@scott-scott.com
dbrockwell@scott-scott.com
jsmallwood@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
KRISTEN M. ANDERSON
DONALD A. BROGGI
MICHELLE E. CONSTON
PATRICK J. RODRIGUEZ
The Helmsley Building
230 Park Ave., 17th Floor
New York, NY 10169
Telephone: 212-223-6444
Facsimile:  212-223-6334
kanderson@scott-scott.com
dbroggi@scott-scott.com
mconston@scott-scott.com
prodriguez@scott-scott.com

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
DAVID R. SCOTT
AMANDA LAWRENCE
156 South Main Street
P.O. Box 192
Colchester, CT 06415
Telephone: 860-537-5537
Facsimile:  860-537-4432
david.scott@scott-scott.com
alawrence@scott-scott.com

*Counsel for Plaintiff Oklahoma Firefighters Pension and Retirement System, and Proposed Class Counsel*