**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**OKLAHOMA FIREFIGHTERS PENSION AND**
**RETIREMENT SYSTEM,**

                     **Plaintiff,**

         - against -

**DEUTSCHE BANK AKTIENGESELLSCHAFT**
**(F/K/A DEUTSCHE BANK AG), ET AL.,**

                  **Defendants.**

---

**23-cv-5095 (JGK)**

<u>**MEMORANDUM OPINION AND**</u>
<u>**ORDER**</u>

**JOHN G. KOELTL, District Judge:**

The plaintiff, Oklahoma Firefighters Pension and Retirement System, a public pension fund for Oklahoma firefighters, brought this putative class action against five banks and their United States affiliates. The five banks are Deutsche Bank Aktiengesellschaft ("DBAG"), Citigroup Global Markets Limited ("CGML"), RBC Europe Limited ("RBC"), HSBC Bank Plc ("HSBC Bank"), and Morgan Stanley & Co. International Plc ("MS International") (together, the "GEMM Banks"). Complaint ("Compl."), Dkt. No. 1 ¶ 25. Their respective United States Affiliates are Deutsche Bank Securities Inc., Citigroup Global Markets Inc. ("CGMI"), RBC Capital Markets, LLC, HSBC Securities (USA) Inc., and Morgan Stanley & Co. LLC. <u>Id.</u>

The plaintiff alleges that the defendants conspired from January 1, 2009 through December 31, 2013 (the "Class Period"), in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, to

1

fix the price of Gilts, which are government bonds issued by His Majesty's Treasury through the United Kingdom Debt Management Office ("DMO").

The defendants move to dismiss the putative class action complaint under Federal Rules of Civil Procedure 12(b)(1), 12(b)(2), 12(b)(3), and 12(b)(6). First, all the defendants argue that the complaint (1) fails to state a claim, (2) fails to plead antitrust standing, and (3) is time-barred. Second, the foreign-entity defendants contend that this Court lacks personal jurisdiction over them. Third, several foreign defendants claim that venue is improper in this District. For the reasons explained below, the motion to dismiss for failure to state a claim is **granted** and the complaint is **dismissed without prejudice.**

**I.**

The following description of the factual allegations in the complaint is accepted as true for purposes of the current motion.

Gilts are sovereign debt securities denominated in British pound sterling and issued by the United Kingdom government. Compl. ¶¶ 12. The DMO handles the issuance process. Id. ¶ 75. By 2014, seventy-two issued Gilts had not yet reached maturity. Id. ¶ 77. Their outstanding value totaled almost one-and-a-half-trillion sterling pounds. Id. Persons residing in the United

Kingdom held about seventy percent of that value. See id. There is, however, an active market for Gilts in the United States. Id. ¶ 93.

Two types of Gilts exist: conventional Gilts and index-linked Gilts. Id. ¶ 76. Conventional Gilts pay the holder a fixed cash payment—a coupon—every six months until the maturity date, at which point the holder receives the final coupon and the principal. Id. Index-linked Gilts differ in that they adjust coupons and the principal to account for accrued inflation from the issue date. See id. During the relevant period, conventional Gilts comprised approximately seventy-five percent of Gilts in issue. Id. The maturity date for Gilts can vary widely, ranging from as little as several months up to fifty-five years. See id. ¶ 77. But most Gilts are long-term bonds. See id.

As with other bonds, dealers and investors price Gilts based on their par value, coupon, maturity date, and yield. Id. ¶ 103. Lowering a bond's price increases its yield—the return that an investor receives by holding the bond to maturity—and makes its yield competitive with prevailing interest rates. Id. ¶¶ 103-06.

### A.

Gilt dealers operate in two markets. In the primary market, the United Kingdom government issues Gilts at auction. Id. ¶ 3. For conventional Gilts, the United Kingdom government conducts a

multiple-price auction, where bidders specify the quantity of bonds they wish to purchase and the prices they are willing to pay. Id. ¶ 83. The DMO then determines the cutoff yield or price and accepts the bids above the cutoff. See id. For index-linked Gilts, the DMO conducts a single-price auction. Id. ¶ 84.

To ensure active participation in primary-market auctions, the DMO selects a discrete number of banks to serve as Gilt-edged Market Makers ("GEMMs"). Id. ¶ 85. As of 2013, twenty-one banks operated as GEMMs, including banks from all five banking groups named as defendants in this action. Id. ¶ 16. The DMO obligates GEMMs, once selected, to play an active role in the issuance, distribution, and marketing of Gilts. Id. ¶ 87. More specifically, the DMO expects each GEMM to purchase—and requires each to bid on—at least two percent of both conventional Gilts and index-linked Gilts on a six-month-rolling-average basis. Id. And ahead of each specific issuance auction, the DMO designates a specific number of GEMMs as market makers who must participate. Id. This ensures that the DMO sells all the Gilts it auctions at every auction. Id.

The DMO monitors and ranks the performance of GEMMs in Primary Market auctions. Id. ¶ 91. To achieve a higher ranking, GEMMs must bid on large amounts of the auctioned bonds at high prices. See id. The DMO rewards high-ranked GEMMs with financial

4

incentives; namely, opportunities to participate in even more lucrative transactions. Id. ¶ 92.

After Gilts are issued in the primary market, bond dealers and investors trade the security in the secondary market. Id. ¶ 93. Participants in the secondary market include various funds, banks, companies, and state and local governments. Id. Trades for Gilts occur over the counter, id., meaning that customers seeking to buy or sell must contact one or more banks directly and request pricing. Id. ¶ 96.

The difference between the quoted price at which a dealer will buy a given Gilt outside an auction (the "bid" price) and the quoted price at which it will sell the same Gilt (the "ask" price) is called the bid-ask spread. Id. Dealers can earn profits by collecting the difference between the bid and ask prices. Id.

The secondary market always stays liquid because the DMO expects GEMMs to buy and sell on demand all Gilts in which they have been recognized as a primary dealer. Id. ¶ 95. In addition, the DMO expects each GEMM to maintain a minimum individual market share of Gilts available to trade on the secondary market. Id.

In a free-flowing market, Gilt dealers compete for customers based on their bid-ask spreads. Id. ¶ 98. Banks that narrow their spreads—in other words, lower profit margins—gain

customers and business. Id. Conversely, banks that widen their spreads can earn higher profit margins but risk losing their customers to rivals that offer narrower spreads. See id.

**B.**

**1.**

According to the plaintiff, the GEMM Banks acted as each banking group's primary dealer for Gilts during the Class Period through dealers stationed in London, United Kingdom. Id. ¶¶ 99-100. The GEMM Banks acquired Gilts in the primary market and priced trades in the secondary market, distributing Gilts as needed to fill customer orders through their sales and trading networks. Id. ¶ 100.

Globally, sales personnel at financial trading hubs like New York City would interact with investors, manage client relationships, and administer customer orders. Id. Each United States Affiliate acted as the American trading hub for each of the five banking groups during the Class Period. Id. However, the Foreign Defendants sometimes transacted directly with United States customers, and at other times transacted with United States customers through their respective United States Affiliates. Id. ¶ 102.

The plaintiff alleges that it entered into Gilt transactions with HSBC Bank, HSBC Securities (USA) Inc., and CGMI during the five-year Class Period, although the plaintiff

has failed to set forth the details of any purchase or sale of any Gilt from any defendant at any time. See id. ¶ 28. In addition, the plaintiff purports to represent a class of all persons or entities who purchased or sold Gilts in the United States directly from the defendants during the Class Period. Id. ¶¶ 177-84. The plaintiff excepts from the putative class the defendants, their employees, affiliates, parents, subsidiaries, and co-conspirators, as well as the United States Government. Id. ¶ 177.

### 2.

The plaintiff alleges that the defendants formed a horizontal conspiracy to widen artificially the bid-ask spreads in the secondary market in the United States. Id. ¶¶ 1, 4-6, 107. The plaintiff claims that, pursuant to this conspiracy, the defendants' traders first manipulated the price and allocation of bonds in the primary market. Id. ¶ 112. Then, the defendants raised their asks and lowered their bids in the secondary market, acting in concert with the other defendants to extract additional profits from their customers. Id. ¶¶ 4, 9, 108, 112.

The defendants allegedly carried out this conspiracy by exchanging highly sensitive information over private chatrooms: allocations in the primary market, bidding and trading strategies, customer-order information, their real-time bid and ask prices, and executed-trade prices. Id. ¶¶ 5-6, 107, 110.

7

Traders from the other four banks would share confidential pricing and strategic information with the DBAG trader, who would then disseminate the information in one-to-one chatrooms back to the several informants. Id. ¶ 113. Although the plaintiff says the chatroom exchanges occurred frequently, id. ¶ 114, the complaint does not allege specifically when they took place, nor the content of the communications. Indeed, the plaintiff fails to allege the contents of any specific conversation.

### 3.

In support of its alleged conspiratorial scheme, the plaintiff offers three main types of evidence. First, the plaintiff offers circumstantial evidence about the structure of the Gilt market. It alleges that: prospective dealers face high barriers to entry, id. ¶¶ 134-35, customers make very large, infrequent transactions at regular intervals, id. ¶¶ 136-38, and customers rely on quotes from individual dealers, id. ¶¶ 139-40. Additionally, the plaintiff alleges that the defendants' Gilt traders are closely networked from lateral employment moves, repetitive dealings, and DMO-sanctioned conferences. Id. ¶¶ 144-45. The plaintiff also alleges that the defendants' traders maintained a high level of direct interfirm communications, which the defendants failed to monitor despite having the means to do so. Id. ¶¶ 146-47.

The plaintiff further points out that, as alleged, the defendants acted contrary to their individual economic interests. Id. ¶¶ 142-43. By widening their spreads, banks risked losing customers and GEMM status. Id. And banks that shared proprietary information did so knowing that their rivals could profit directly from the anticipated trade to the sharing bank's detriment. Id.

Second, the plaintiff claims that Gilt yield curves were lower during the Class Period, namely 2009 to 2013, when compared to the two preceding years, namely 2007 and 2008. Id. ¶ 148 Fig. 6. The plaintiff concedes, however, that other economic factors influenced the yield curves and prices of Gilts. Id. ¶ 149. For example, the plaintiff concedes that the Bank of England began quantitative easing in 2009, the first year of the alleged conspiracy. Id. ¶ 78. Through the practice of quantitative easing, the Bank of England attempted to combat inflation by purchasing bonds to drive up their prices, thereby lowering their yields. Id. Nevertheless, the plaintiff claims that because the defendants' alleged cartel comprised about twenty percent of the total banks designated as GEMMs—five out of twenty-one—the defendants exerted significant influence and control over Gilt prices. Id. ¶ 149.

Third, the plaintiff highlights an ongoing United Kingdom regulatory investigation. On May 24, 2023, the United Kingdom

Competition and Markets Authority ("CMA"), the United Kingdom's principal antitrust regulator, announced that it had issued a Statement of Objections to each of the five defendants following a five-year investigation which began in November 2018. Id. ¶ 117. The CMA also shared its "provisional decision that . . . [the five] global banks broke competition law by taking part in a series of one-to-one online exchanges of competitively sensitive information on pricing and other aspects of their trading strategies on UK bonds." Id. ¶ 120.

The accompanying Press Release specified that these information exchanges "took place in one-to-one Bloomberg chatrooms between a small number of traders who worked at the banks," and that the communications "included details on pricing and other aspects of their trading strategies." Id. ¶ 118. The Press Release added that "[b]y unlawfully exchanging competitively sensitive information rather than fully competing, the banks involved in these arrangements could have denied the full benefits of competition to those they traded with—including among others, pension funds." Id. ¶ 119. If in the future the CMA confirms that a violation occurred, some of the defendants may face substantial fines. Id. ¶¶ 122–28.

Not all of the defendants may face substantial fines, however, because as alleged, the CMA granted provisional immunity under its leniency program to DBAG after DBAG

10

proactively alerted the CMA to its participation in the information-sharing scheme. Id. ¶¶ 129-30. CGML then also applied for leniency and received a discount on any future fines conditioned on continued cooperation. Id. ¶ 131. CGML additionally reached a settlement with the CMA which will apply a further, separate discount to any future fines. Id. These developments are notable because the plaintiff alleges that the CMA extends leniency to antitrust cooperators only if the immunity recipient or settling party admits its participation in and submits evidence of a cartel in violation of United Kingdom competition law. Id. ¶ 132.

The plaintiff further alleges that certain defendants have been fined, sanctioned, pleaded guilty to, or are under investigation for various other antitrust violations. Id. ¶¶ 150-76.

### C.

The plaintiff filed this lawsuit on June 16, 2023. The plaintiff claims it could not have brought this action sooner because the defendants fraudulently concealed their conduct. Id. ¶¶ 185-93. On September 28, 2023, the defendants filed the present motion to dismiss. See Joint Mot., Dkt. No. 62.

## II.

### A.

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept the allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007).  The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient."[1] Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). To survive a motion to dismiss, the plaintiff's complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id. When presented with a motion to dismiss pursuant to Rule 12(b)(6),

---

[1] Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

the Court may consider documents that are referenced in the complaint, documents that the plaintiff relied on in bringing suit and that are either in the plaintiff's possession or that the plaintiff knew of when bringing suit, or matters of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002).

**B.**

An antitrust plaintiff can survive a motion to dismiss in two ways. First, a plaintiff can "assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws," with the classic example being "a recorded phone call in which two competitors agreed to fix prices at a certain level." Mayor & City Council of Balt. v. Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013). "But, in many antitrust cases, this type of 'smoking gun' can be hard to come by, especially at the pleading stage." Id. Accordingly, a complaint may provide a basis for inferring an agreement by alleging "conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." Id. Plus factors may include facts like "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." Id.

"An antitrust complaint that fails to connect each or any individual entity to the overarching conspiracy . . . cannot ordinarily survive a motion to dismiss." In re Mexican Gov't Bonds Antitrust Litig. ("MGB"), 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019). To state a claim post-Twombly, a complaint must provide a basis to infer "the culpability of the specific defendants named in the complaint." Id. "[C]laims as to the motivations or actions of [the defendants] as a general collective bloc, or generalized claims of parallel conduct, must also be set aside . . . as impermissible group pleading." In re Interest Rate Swaps Antitrust Litig., No. 16-MC-2704, 2018 WL 2332069, at *15 (S.D.N.Y. May 23, 2018).

Although courts "traditionally treat personal jurisdiction as a threshold question to be addressed prior to consideration of the merits of a claim, that practice is prudential and does not reflect a restriction on the power of the courts to address legal issues." ONY, Inc. v. Cornerstone Therapeutics, Inc., 720 F.3d 490, 498 n.6 (2d Cir. 2013). "In cases involving multiple defendants—over some of whom the court indisputably has personal jurisdiction—in which all defendants collectively challenge the legal sufficiency of the plaintiff's cause of action," courts can proceed "directly to the merits on a motion to dismiss." Id.

### III.

Because this Court "indisputably has personal jurisdiction" over the United States Affiliates, the Court proceeds directly to the merits of the defendants' joint motion to dismiss for failure to state a claim upon which relief can be granted. See id. "[T]his course of action is particularly appropriate where, as here, the personal jurisdictional challenges are based on factual allegations that are, in this early posture, still under development." Id.

### A.

The plaintiff alleges that the defendants conspired to fix Gilt spreads and carried out their conspiratorial scheme by exchanging sensitive information over electronic chatrooms. More specifically, the plaintiff alleges that "[d]uring the Class Period, [the] [d]efendants entered into an agreement to reduce competition among themselves by fixing and manipulating the prices of Gilt Bonds sold in the United States," in violation of the Sherman Act, 15 U.S.C. §§ 1, et seq. Compl. ¶¶ 195-98. The complaint alleges that this was a price-fixing conspiracy, id. ¶

196–98, which is a _per se_ violation of Sherman Act § 1. United

States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218 (1940).[2]

But the complaint "is made up of almost entirely conclusory

allegations and is essentially devoid of any evidence, direct or

circumstantial, to support the conclusion that [the defendants]

colluded with one another." In re ICE LIBOR Antitrust Litig.

("ICE LIBOR"), No. 19 Civ. 439, 2020 WL 1467354, at *4 (S.D.N.Y.

Mar. 26, 2020). There is not a single conversation or document

described in detail, nor any individual trade or pricing

decision reported with specificity.

### 1.

The plaintiff fails to allege direct evidence of a

conspiracy. "Direct evidence of a conspiracy is explicit and can

show one exists without any inferences." City of Pontiac Police

& Fire Ret. Sys. v. BNP Paribas Sec. Corp., 92 F.4th 381, 391

(2d Cir. 2024). Here, the plaintiff points to the CMA's

investigation into the defendants' information exchange

---

[2] Alternatively, the plaintiff alleges that the conspiracy was an unreasonable restraint of trade because the conspiracy resulted in substantial anticompetitive effects in the Gilt market with no legitimate business justification for, nor procompetitive benefits from, the defendants' conduct. Compl. ¶¶ 195, 198. "The exchange of price data and other information among competitors does not invariably have anticompetitive effects" and thus "do[es] not constitute a _per se_ violation of the Sherman Act." See United States v. U.S. Gypsum Co., 438 U.S. 422, 441 n.16 (1978). In restraint-of-trade cases, courts apply the rule of reason and weigh harms against benefits to determine whether the practice alleged is an "undue restraint." Standard Oil Co. of N.J. v. United States, 221 U.S. 1, 60–62 (1911). However, the complaint fails to engage in any particularized factual analysis of the alleged particular restraints on the United States secondary market for Gilts, much less a comparison to justifications and benefits.

concerning Gilts. Compl. ¶¶ 117-28. It adds that under United Kingdom law, both DBAG and CGML "admitted participation in a cartel that agreed to prevent, restrict, or distort competition in the Gilt Bonds market." Id. ¶ 132.

The ongoing investigation, and even the cooperation of two named defendants, is not direct evidence that any of the defendants participated in the price-fixing conspiracy alleged in this case. See In re Elevator Antitrust Litig., 502 F.3d 47, 51-52, 51 n.6 (2d Cir. 2007); MGB, 412 F. Supp. 3d at 389. A foreign-government investigation cannot by itself "support an allegation of a plausible conspiracy." See In re European Gov't Bonds Antitrust Litig. ("EGB II"), No. 19 Civ. 2601, 2022 WL 768680, at *21 (S.D.N.Y. Mar. 14, 2022).

Moreover, the complaint overstates the CMA's provisional findings. The CMA is investigating the exchange of confidential information in violation of United Kingdom regulations that prevent such exchanges.[3] CMA, CMA provisionally finds 5 banks broke competition law on UK bonds, (May 24, 2023), https://www.gov.uk/government/news/cma-provisionally-finds-5-banks-broke-competition-law-on-uk-bonds ("Press Release"). There is no finding that the banks conspired to fix spreads on Gilts sold in the United States as alleged in this case. Id.

---

[3] At oral argument, the plaintiff's counsel conceded that the United Kingdom competition law is "broader"—that is, renders illegal a wider range of conduct—than section 1 of the Sherman Act.

Likewise, the wrongdoing that DBAG and CGML allegedly admitted, and that the CMA provisionally found, is that the defendants "unlawfully shared competitively sensitive information." Compl. ¶¶ 7, 132. "Information exchange is an example of a facilitating practice that can help support an inference of a price-fixing agreement," not direct evidence of one. See Todd v. Exxon Corp., 275 F.3d 191, 198 (2d Cir. 2001). Chats that share sensitive information—at best—"suggest the sharing of information that could lead to coordinated trading and bidding," not direct coordination itself. In re Treasury Sec. Auction Antitrust Litig. ("Treasury II"), 595 F. Supp. 3d 22, 46 (S.D.N.Y. 2022), aff'd, 92 F.4th 381 (2d Cir. 2024). In this case, no defendant admitted, nor did the CMA find, that any defendant conspired over five years to fix the spread on Gilts traded in the United States.

In this case, the complaint does not contain "the rare smoking gun," like chats that "unmistakably show traders, acting on behalf of [the defendants], agreeing to fix prices at a specific level." Cf. In re GSE Bonds Antitrust Litig. ("GSE"), 396 F. Supp. 3d 354, 361 (S.D.N.Y. 2019); In re London Silver Fixing, Ltd., Antitrust Litig., 332 F. Supp. 885, 892-94, 901 (S.D.N.Y. 2018). Accordingly, the complaint fails to set forth direct evidence of a price-fixing conspiracy.

**2.**

Having alleged no direct evidence, the plaintiff must "present circumstantial facts supporting the <u>inference</u> that a conspiracy existed." <u>Mayor & City Council of Balt.</u>, 709 F.3d at 136. To do so, the plaintiff must plead (1) parallel conduct and (2) "plus factors." <u>Id.</u> Here, the plaintiff has failed to allege any facts to show that the defendants engaged in parallel conduct that suggests the existence of a price-fixing conspiracy and each defendant's participation in that conspiracy. <u>See</u> <u>MGB</u>, 412 F. Supp. 3d at 389.

The complaint does not identify any specific quote by any defendant to any customer, nor does it plead that any two defendants ever coordinated prices on Gilts traded in the United States. Indeed, the complaint contains no individualized allegations of any specific quotes, transactions, or chats. The complaint is instead replete with conclusory group allegations that the defendants "fixed bid-ask spreads on customer orders for Gilt Bonds in the post-auction, secondary market," and orchestrated this price-fix "primarily through non-public, invitation-only, cross-bank electronic chatrooms." Compl. ¶ 107; <u>see also</u> <u>id.</u> ¶¶ 4-5, 28, 177.

This kind of barebones group pleading of parallel conduct is insufficient. <u>Treasury II</u>, 595 F. Supp. 3d at 44, 50-51. Without any allegations relating to specific actions taken by

19

each defendant, group pleading fails to "tie[] each defendant to the conspiracy" by showing that each defendant engaged in parallel conduct. See GSE, 396 F. Supp. 3d at 364. The complaint in this case does not substantiate its price-fixing claims with any pricing or trading data specific to any defendant, and therefore fails to "articulate a link between the[] allegations and the specific defendants named in the complaint." See MGB, 412 F. Supp. 3d at 389. The plaintiff fails to point to any comparable complaint that has found parallel conduct absent specific factual allegations of such parallel trading or pricing.

The plaintiff notes correctly that it is not required to plead statistical analyses at this stage of the litigation. But the plaintiff must somehow establish parallel conduct in which each defendant participated. See GSE, 396 F. Supp. 3d at 364–65 ("At this stage, a statistical analysis, like any other allegation, need only be plausible."). The plaintiff here fails to do that with its single chart, which merely displays the

yield curve for Gilts during the Class Period and the two
preceding years.[4] See Compl. ¶ 148 Fig. 6.

   As the defendants correctly point out, the yield curves "do
not distinguish at all between defendant and non-defendant
dealers." GSE, 396 F. Supp. 3d at 365. Such "aggregate
statistics do not alone suffice to impute wrongful conduct to
any particular defendant." In re European Gov't Bonds Antitrust
Litig. ("EGB I"), No. 19 Civ. 2601, 2020 WL 4273811, at *17
(S.D.N.Y. Jul. 23, 2020). Accordingly, "in the absence of any
other allegations that would allow the Court to infer the
participation of the individual [d]efendants, . . . the group
statistical pleadings cannot carry the day." MGB, 412 F. Supp.
3d at 390.

   Moreover, the plaintiff's statistical allegations defeat
themselves. "[T]here is an obvious alternative explanation to
the alleged conspiratorial conduct" supposedly demonstrated by
the yield-curves chart. See Cenedella v. Metro. Museum of Art,
348 F. Supp. 3d 346, 359 (S.D.N.Y. 2018). The plaintiff argues
that the yield curves for Gilts fell after the defendants formed

---

[4] At oral argument, and in a supplemental submission, Dkt. No. 82 at 2, the
plaintiff's counsel conceded that the complaint included the yield curves
to demonstrate motive only, and not parallel conduct. But the complaint plainly
intended to use the chart to show both motive and parallel conduct.
Immediately following the yield-curves chart, the complaint alleges that the
"[d]efendants possessed enough market power to inflate the prices of Gilt
Bonds above what their true value would be, and was, in a competitive
market." Compl. ¶ 149. In any event, the yield curves chart fails to
demonstrate parallel conduct.

a price-fixing conspiracy. But the complaint also alleges that the "Bank of England actively participates in the Gilt Bonds market through open market operations," the Bank "first began utilizing quantitative easing in March 2009," and the "[u]se of quantitative easing was widespread during the Class Period." Compl. ¶ 78.

Quantitative easing "involves purchasing bonds to push up their prices" and "reduce long-term interest rates." Id. Pushing up bond prices lowers their yields. Id. ¶ 105. Therefore, by the plaintiff's own admission, quantitative easing is "an obvious alternative explanation" for why yield curves fell during the Class Period. See Cenedella, 348 F. Supp. 3d at 359. This obvious explanation renders even less plausible the inference that yield curves fell because the defendants conspired to fix spreads.

The plaintiff's failure to plead parallel conduct is even more striking given the implausibly wide-ranging conspiracy alleged. In Alaska Department of Revenue, Treasury Division v. Manku, the plaintiffs alleged that the defendants formed a "super-desk involving more than twenty entities in different countries as well as individual traders, conspiring every day, nearly all day, tainting every one of their trades for some seven years." No. 20-1759-cv, 2021 WL 3027170, at *4 (2d Cir. Jul. 19, 2021) (summary ord.). Considering the all-encompassing

22

nature of the conspiracy alleged, the court called it "simply not plausible." Id.

As in Alaska Department, the plaintiff alleges a wide-ranging conspiracy whereby the five defendant banking groups tainted Gilt trades with their clients in the United States over a five-year period. Compl. ¶¶ 5, 28, 107, 112, 177. The plaintiff seeks to represent a class of "[a]ll persons or entities who purchased or sold Gilt Bonds in the United States directly from [the] [d]efendants from at least as early as January 1, 2009, through at least December 31, 2013." Id. ¶ 177. Here, as in Alaska Department, the Court must "evaluate [the plaintiff's] claims as they are alleged: an antitrust conspiracy involving all defendants and affecting all trades with the defendants." Alaska Dep't, 2021 WL 3027170, at *4.

The plaintiff's factual allegations fail to render plausible such a wide-ranging conspiracy. The complaint does not explain how the defendants "were able to wield such control over the secondary market"—that is, how five out of twenty-one GEMMs could "impact every [United States] trade with every defendant" for five years without losing customers to the sixteen non-participating banks. See id. Such control is especially implausible given that the complaint alleges that each GEMM must buy and sell Gilts on demand and maintain a minimum individual market share of Gilts available to trade on the secondary

23

market. Compl. ¶ 95. Although a plaintiff can allege plausibly that "a numerical minority of dealers" control "most of the market," see GSE, 396 F. Supp. 3d at 362, the complaint contains no such plausible allegation in this case. Its other allegations render implausible the inference that the five defendant groups conspired to dominate the market. See City of Pontiac, 92 F.4th at 397-400.

In sum, the plaintiff offers only "skeletal allegations of the possibility of a conspiracy." ICE LIBOR, 2020 WL 1467354, at *7. Much more is required, namely, specific allegations that demonstrate parallel conduct and tie each defendant to the alleged price-fixing scheme. MGB, 412 F. Supp. 3d at 391. "Because [the plaintiff] fail[s] to allege parallel conduct with respect to the alleged [section 1] conspiracy, [it] cannot demonstrate an agreement to conspire based on indirect evidence irrespective of [its] plus factors." City of Pontiac, 92 F.4th at 401.

### 3.

Moreover, the plaintiff also fails to plead adequate plus factors that suggest the formation of a price-fixing conspiracy. General plus factors indicate only that the market as a whole may be susceptible to collusion, and thus "are not enough." EGB II, 2022 WL 768680, at *20. The complaint must plead "plus factors for each defendant." Id. Such specific plus factors must

support the plausible inference that each named defendant entered the alleged conspiracy. <u>See</u> <u>Mayor & City of Balt.</u>, 709 F.3d at 136-40.

The plaintiff fails to allege specific plus factors against any of the defendants. It points to the CMA's preliminary findings, but that investigation concerns the exchange of information about conventional Gilts, not a price-fixing conspiracy covering the secondary market for all Gilts traded by the defendants in the United States. Moreover, by definition, a provisional finding is subject to change. And "the mere fact that regulatory entities are investigating the possibility of . . . misconduct . . . is not a plus factor." <u>In re London Silver Fixing, Ltd., Antitrust Litig.</u>, 213 F. Supp. 3d 530, 561 (S.D.N.Y. 2016); <u>MGB</u>, 412 F. Supp. 3d at 390; <u>In re Commodity Exch., Inc.</u>, 213 F. Supp. 3d 631, 662 (S.D.N.Y. 2016).

The investigation is not a specific plus factor even as to the two banks participating in the CMA's leniency program. Although the real-time exchange of pricing information is the classic "example of a facilitating practice that can help support an inference of a price-fixing agreement," <u>Todd</u>, 275 F.3d at 198, the public evidence in this case is limited in time and scope. DBAG admitted that its trader exchanged information about conventional Gilts over chatroom conversations lasting less than one year with CGML and HSBC Bank, more than one year

with MS International, and more than three years with RBC. Press Release. CGML likewise admitted one-to-one conversations with DBAG and MS International that both lasted less than one year. Id. These admitted chats—spanning various time periods and involving five out of twenty-one GEMM banks, only two of which have conceded some wrongdoing under British competition law—do not give rise to the plausible inference that any bank conspired to fix the spread on every Gilt transaction involving the defendant banks in the United States for five years.[5] See City of Pontiac, 92 F.4th at 399–400; In re Elevator Antitrust Litig., 502 F.3d at 51–52, 51 n.6.

The plaintiff's general plus factors are also insufficient to show that any individual defendant participated in a price-fixing conspiracy in the United States. That yield curves fell and remained depressed during the alleged conspiracy period is not a plus factor in view of the obvious explanation supplied by the Bank of England's quantitative-easing program. Also unavailing is the plaintiff's argument that increased Gilt prices provided an economic incentive to collude. While

---

[5] At oral argument, the plaintiff's counsel emphasized CGML's settlement as a plus factor. The complaint alleges that under United Kingdom law, settlement "is the process whereby a business under investigation is prepared to admit that it has breached competition law." Compl. ¶ 131. This allegation fails as a plus factor for the same reason as the leniency-program allegations. The public evidence in the CMA's investigation does not suggest plausibly that the conspiracy alleged in this case—namely, a price-fixing conspiracy with respect to the purchase and sale of Gilts in the United States—existed.

depressed yield curves do demonstrate elevated Gilt prices, they do not show that individual defendants were able to use such prices to profit, particularly when they would have faced competition from the numerous other participants in the market who are not alleged to be members of the conspiracy.

The plaintiff points to other investigations and findings, but these are also not plus factors. The defendants' alleged wrongdoing in other markets "does not constitute evidence that" they conspired to fix spreads in the Gilt market. In re Commodity Exch., 213 F. Supp. 3d at 661. The Court of Appeals for the "Second Circuit has expressly rejected this sort of 'if it happened there, it could have happened here' reasoning." MGB, 412 F. Supp. 3d at 391 (citing In re Elevator Antitrust Litig., 502 F.3d at 52).

Relying on Federal Rule of Evidence 404(b), the plaintiff asserts that evidence of wrongdoing in other markets constitutes a plus factor. But "absent any evidence of linkage," allegations of wrongdoing in other markets do not plausibly suggest wrongdoing in this market. In re Elevator Antitrust Litig., 502 F.3d at 52. Insofar as the Rules of Evidence have any bearing at the motion-to-dismiss stage at all, Rule 404(b) does not permit the use of bad acts to show propensity. Fed. R. Evid. 404(b). Indeed, the more pertinent rules here are Rules 401 and 403. To the extent that the plaintiff relies on other bad acts to show

27

motive or opportunity, such allegations are simply not relevant, or at least not relevant enough to justify consideration as a plus factor. See In re Elevator Antitrust Litig., 502 F.3d at 51 n.6, 52.

The plaintiff relies on cases decided by courts in other circuits. Milliken & Co. v. CNA Holdings, Inc., No. 3:08-CV-578, 2011 WL 3444013, at *10 (W.D.N.C. Aug. 8, 2011); In re Flash Memory Antitrust Litig. ("FM"), 643 F. Supp. 2d 1133, 1148-49 (N.D. Cal. 2009); In re Static Random Access Memory Antitrust Litig. ("SRAM"), 580 F. Supp. 2d 896, 903 (N.D. Cal. 2008). But those courts considered other conspiracies as a plus factor in relation to the alleged conspiracies because they were linked "close[ly] in time, geographic area, and involved several of the same entities," Milliken & Co., 2011 WL 3444013, at *10, or they involved the same employees alleged to have conspired. FM, 643 F. Supp. 2d at 1149; SRAM, 580 F. Supp. 2d at 903.

In this case, although the other conspiracies ran roughly concurrently with the one alleged in this case, the plaintiff does not allege that the same traders were involved. To the contrary, the plaintiff alleges that Gilt traders operated independently from other bond traders within each bank's fixed-income divisions. See Compl. ¶¶ 99-102. Nor does the plaintiff allege that the other cases and investigations concern "the very conduct alleged" here: conspiring to fix the spread of Gilts in

the United States. Cf. In re Foreign Exch. Benchmark Rates
Antitrust Litig. ("FX"), 74 F. Supp. 3d 581, 590-94 (S.D.N.Y.
2015) (crediting as circumstantial evidence "detailed
allegations of investigations into the manipulation of FX
benchmark rates by regulators in seemingly every significant
financial market in the world"). In similar cases involving
financial instruments, courts in this District have viewed other
alleged conspiracies formed by the same banking families without
more as a nonfactor. See, e.g., MGB, 412 F. Supp. 3d at 391; In
re Commodity Exch., Inc., 213 F. Supp. 3d at 661. The Court does
so again here.

Finally, the plaintiff points to certain structural
factors. While some of them have been considered as plus factors
in other cases, see EGB II, 2022 WL 768680, at *20, they do not
amount to sufficient indicia that the individual defendants
entered into the price-fixing conspiracy alleged in this case.

Because the complaint fails to allege both parallel conduct
and adequate plus factors, the plaintiff has "not nudged [its]
claims across the line from conceivable to plausible," and thus
its "complaint must be dismissed." Twombly, 550 U.S. at 570.
Accordingly, the motion to dismiss the complaint for failure to
allege a plausible price-fixing conspiracy is **granted.**

**B.**

The defendants also contend that the plaintiff lacks
antitrust standing to bring this suit because the plaintiff did
not suffer an antitrust injury. Defs' Joint Memorandum, Dkt. No.
63, at 15–18. "An antitrust plaintiff must show . . . antitrust
standing at the pleading stage." In re Aluminum Warehousing
Antitrust Litig., 833 F.3d 151, 157 (2d Cir. 2016). To meet the
antitrust standing requirement, the plaintiff must allege
plausibly (1) that it suffered an antitrust injury, and (2) that
it is an "efficient enforcer[] of the antitrust laws." Id. "In
determining antitrust standing, [courts] assume the existence of
an antitrust violation." Harry v. Total Gas & Power N. Am.,
Inc., 889 F.3d 104, 115 (2d Cir. 2018).

To allege an antitrust injury, the plaintiff must first
allege plausibly that it was "injured." See 15 U.S.C. § 15. The
complaint must make out the plaintiff's injury based on factual
allegations, not mere conclusory allegations that restate the
necessary legal principles. See Iqbal, 556 U.S. at 678–80.
Additionally, the plaintiff's injury must be the type of injury
that "the antitrust laws were intended to prevent and that flows
from that which makes [the] defendants' acts unlawful."
Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc., 429 U.S. 477, 489
(1977). "The need for this showing is at least as great under

the per se rule as under the rule of reason." Atl. Richfield Co.
v. USA Petrol. Co., 495 U.S. 328, 344 (1990).

In this case, the plaintiff alleges that it was injured
when it entered into Gilt transactions with several of the
defendants at fixed prices. Compl. ¶¶ 28, 116. These conclusory
allegations clear the "low threshold" required to show Article
III injury in fact. See John v. Whole Foods Mkt. Grp., Inc., 858
F.3d 732, 736–38 (2d Cir. 2017).[6] The plaintiff's injury
allegations place a concrete and particularized injury "within
the realm of possibility." See Harry, 889 F.3d at 111. While
"that is enough" to show Article III injury in fact for
jurisdictional purposes, it is not enough to allege a plausible
antitrust injury on the merits. See id. at 111, 116. Much more
factual matter is required to allege plausibly that the
plaintiff suffered an antitrust injury. See id. at 116.

The complaint does not point to any transaction in which
the plaintiff paid too much or received too little when it
bought or sold a Gilt with any of the defendants. Indeed, the
plaintiff could not in any event, having failed to allege
plausibly any episodic price-fixing that affected the
plaintiff's own trades.

---

[6] The defendants do not contend that the plaintiff has failed to allege a
factual basis sufficient to show that it suffered a harm for purposes of
alleging Article III standing. The pleading standard for constitutional
standing is lower than the standard necessary to plead the injury required to
state a substantive cause of action. See Harry, 889 F.3d at 110–11.

Nor do the plaintiff's general allegations that it traded with some of the defendants at some unspecified times during the Class Period suffice to make out antitrust injury. The plaintiff has failed to allege a plausible price-fixing conspiracy that affected the entire market for Gilts in the United States over a five-year period.

Some courts have viewed general allegations that the plaintiffs directly transacted in the manipulated market at some point during the conspiracy period as sufficient to make out antitrust injury at the motion-to-dismiss stage. See, e.g., FX, 74 F. Supp. 3d at 587, 595-98; GSE, 396 F. Supp. 3d at 366-67. But in such cases, the plaintiffs plausibly alleged a pervasive conspiracy that infected the pertinent markets for the entirety of the alleged conspiracy periods. See FX, 74 F. Supp. 3d at 590-94 (concluding that the complaint "adequately allege[d] that [the] [d]efendants engaged in a long-running conspiracy to manipulate" the prices of FX instruments); GSE, 396 F. Supp. 3d at 361-63.

This case is not like FX, GSE, and similar cases. The plaintiff has failed to allege a plausible five-year conspiracy to fix spreads in the United States Gilt market. In the absence of a plausibly pleaded pervasive price-fixing conspiracy, the plaintiff's general allegations of injury do not show that it suffered an antitrust injury. And because the complaint does not

32

set out the details of the plaintiff's specific trades, "let alone a connection between [the] [d]efendants' unlawful conduct and that non-injury," it fails to allege any plausible episodic antitrust injury. Cf. Harry, 889 F.3d at 116.

The plaintiff has failed to allege plausibly that it suffered an antitrust injury. Therefore, the motion to dismiss for failure to plead antitrust injury is **granted**.

### IV.

Because the complaint must be dismissed for failure to state a plausible price-fixing conspiracy, it is unnecessary to reach the remaining bases for dismissal, including whether the complaint is time-barred. It is also unnecessary to reach the additional claims by the foreign defendants that the complaint should be dismissed for lack of personal jurisdiction over them and for improper venue.

Leave to amend should be freely given when justice so requires. Fed. R. Civ. P. 15(a)(2). Because the plaintiff has not "repeated[ly] fail[ed] to cure deficiencies" to an extent warranting dismissal with prejudice, see Foman v. Davis, 371 U.S. 178, 182 (1962), the plaintiff's amended complaint is dismissed **without prejudice.**

### CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed, the arguments

33

are either moot or without merit. For the foregoing reasons, the defendants' joint motion to dismiss the plaintiff's complaint for failure to state a claim is **granted**, the various defendants' motion to dismiss for lack of personal jurisdiction and for improper venue is **denied as moot**, and the complaint is **dismissed without prejudice**.

If the plaintiff wishes to file an amended complaint, the plaintiff must file a motion to amend, including a copy of the amended complaint and explaining how the amended complaint solves the deficiencies noted in this opinion, by **October 4, 2024**. The defendants may respond by **October 25, 2024**. The plaintiff may reply by **November 4, 2024**. If the plaintiff does not move to file an amended complaint by **October 4, 2024**, the current complaint will be dismissed with prejudice.

The Clerk is directed to close all pending motions.

**SO ORDERED.**

Dated: New York, New York
       September 13, 2024

_____
                    **John G. Koeltl**
         **United States District Judge**