**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**OKLAHOMA FIREFIGHTERS PENSION AND RETIREMENT SYSTEM, ET AL.,**

**Plaintiffs,**

**- Against -**

**DEUTSCHE BANK AKTIENGESELLSCHAFT, ET AL.,**

**Defendants.**

---

**23-cv-5095 (JGK)**

**Memorandum Opinion and Order**

**JOHN G. KOELTL, District Judge:**

The plaintiffs' claims arise from the defendants' alleged conspiracy to fix, raise, maintain, stabilize, and otherwise manipulate the prices of United Kingdom government bonds, known as Gilts, that were sold and purchased throughout the United States from January 1, 2009, through December 31, 2013 (the "Class Period") in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1. Am. Compl. ¶ 1, ECF No. 161. The plaintiffs allege that the defendants used private online chatrooms to collude in manipulating the allocation of Gilts in the primary market, the prices of Gilts in the secondary market, and the prices of futures and options tied to Gilts. Id. ¶ 6. As a result of the alleged conspiracy, the plaintiffs claim that they were injured by the artificially set prices for Gilts and related futures and options set by the defendants. Id. ¶ 13.

The plaintiffs, Oklahoma Firefighters Pension and Retirement System ("Oklahoma Firefighters"), Ohio Carpenters Pension Fund ("Ohio Carpenters"), and Hehmeyer LLC ("Hehmeyer"), on behalf of themselves and all

others similarly situated brought this action against Defendants Deutsche Bank Aktiengesellschaft ("DBAG") and Deutsche Bank Securities Inc. ("DBSI"); Citigroup Global Markets Limited and Citigroup Global Markets Inc. (together, "Citigroup"); RBC Europe Limited and RBC Capital Markets LLC (together, "RBC"); HSBC Bank PLC and HSBC Securities (USA) Inc. (together, "HSBC"); and Morgan Stanley & Co International PLC and Morgan Stanley & Co. LLC (together, "Morgan Stanley") for antitrust and conspiracy claims. Id. at 1, ECF No. 161.

On June 16, 2023, Oklahoma Firefighters filed the original complaint. See ECF No. 1 ("Compl."). On September 28, 2023, the defendants jointly moved to dismiss pursuant to Rules 12(b)(2), 12(b)(3), and 12(b)(6) of the Federal Rules of Civil Procedure. See ECF No. 62. On September 13, 2024, this Court granted the defendants' motion to dismiss for failure to state a claim without prejudice to the plaintiff's ability to amend the complaint and denied the motion to dismiss for lack of personal jurisdiction and improper venue as moot. Okla. Firefighters Pension & Ret. Sys. v. Deutsche Bank Aktiengesellschaft ("Okla. Firefighters I"), No. 23-cv-5095, 2024 WL 4202680, at *12 (S.D.N.Y. Sept. 13, 2024). In Okla. Firefighters I, this Court found that Oklahoma Firefighters—the only plaintiff at that time—had failed to allege direct evidence of a conspiracy, namely, "the rare smoking gun, like chats that unmistakably show traders, acting on behalf of the defendants, agreeing to fix prices at a specific level." Id. at *6.

Additionally, the Court found that the plaintiff had failed to allege circumstantial facts sufficient to support a plausible inference of a conspiracy. Id. at *7. The Court found that the complaint did not identify any specific quote given by any defendant to any customer, or any instance in which two defendants coordinated prices for Gilts traded in the United States. Id. The Court also concluded that the plaintiff's statistical allegations were unpersuasive because there was an obvious alternative explanation: the Bank of England's active participation in the Gilt market through quantitative easing may have increased Gilt prices. Id. at *7–8. Moreover, the Court found the plaintiff's allegations implausible because the complaint failed to explain how five of the then-pleaded twenty-one Gilt-edged Market Makers ("GEMMs") could have affected every Gilt trade in the United States without losing customers to the sixteen non-participating banks. Id. at *8.

Finally, the Court found that the plaintiff had failed to allege any plus factor supporting the existence of a price-fixing conspiracy because the mere fact of a regulatory investigation cannot support a plus factor. Id. at *9–10. The Court also concluded that the plaintiff had failed to allege antitrust standing because the complaint did not identify any transaction in which the plaintiff "paid too much or received too little when it bought or sold a Gilt with any of the defendants." Id. at *11.

On January 22, 2025, Oklahoma Firefighters, Citigroup, HSBC, RBC, and Morgan Stanley filed a joint motion for preliminary approval of a settlement. ECF No. 115. The Court granted that motion on March 17, 2025. ECF

No. 123. However, to date, no settlement approval fairness hearing has been held. See ECF No. 184.

On September 3, 2025, Oklahoma Firefighters, joined by Ohio Carpenters and Hehmeyer, filed an amended complaint. ECF No. 161. DBAG and DBSI now move to dismiss the amended complaint pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6). ECF No. 166.

For the reasons explained below, the motion is **denied**.

## I.

### A.

"Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal." 15 U.S.C. § 1. To state a claim under Section 1 of the Sherman Act, a plaintiff must first allege an agreement or other form of concerted action between at least two legally distinct economic actors. Cap. Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc., 996 F.2d 537, 542 (2d Cir. 1993).

If the plaintiff plausibly alleges such an agreement, the plaintiff must then allege that the agreement imposed an unreasonable restraint of trade. See id. An agreement may be unreasonable either because it is unlawful per se or because it violates the rule of reason. See id. The per se rule applies only to a limited class of restraints that are "plainly anticompetitive" and lack any apparent redeeming procompetitive value. Cont'l T.V., Inc. v. GTE Sylvania Inc., 433 U.S. 36, 49–50 (1977); see also Broad. Music, Inc. v. CBS, 441 U.S. 1,

8 (1979). Such restraints are "conclusively presumed illegal without further examination." Broad. Music, 441 U.S. at 8. Horizontal price-fixing agreements among competitors are the classic example of per se unlawful restraints. See United States v. Socony-Vacuum Oil Co., 310 U.S. 150, 218 (1940).

**B.**

In deciding a Rule 12(b)(6) motion to dismiss for failure to state a claim, the Court must accept the allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir. 2007). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985).

To survive a motion to dismiss, the plaintiff's complaint must contain "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). While the Court should construe the factual allegations in the light most favorable to the plaintiff, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Id.

When presented with a motion to dismiss a complaint, the Court may consider documents attached to or referenced in the complaint, documents that

the plaintiff either possessed or knew about and relied on in bringing the lawsuit, or matters of which judicial notice may be taken. Goel v. Bunge, Ltd., 820 F.3d 554, 559 (2d Cir. 2016).

An antitrust plaintiff can survive a motion to dismiss in two ways. First, a plaintiff can "assert direct evidence that the defendants entered into an agreement in violation of the antitrust laws," with the classic example being "a recorded phone call in which two competitors agreed to fix prices at a certain level." Mayor & City Council of Balt. v. Citigroup, Inc., 709 F.3d 129, 136 (2d Cir. 2013). "But, in many antitrust cases, this type of 'smoking gun' can be hard to come by, especially at the pleading stage." Id. Accordingly, a complaint may provide a basis for inferring an agreement by alleging "conscious parallelism, when such interdependent conduct is accompanied by circumstantial evidence and plus factors." Id. Plus factors may include facts like "a common motive to conspire, evidence that shows that the parallel acts were against the apparent individual economic self-interest of the alleged conspirators, and evidence of a high level of interfirm communications." Id.

"An antitrust complaint that fails to connect each or any individual entity to the overarching conspiracy . . . cannot ordinarily survive a motion to dismiss." In re Mexican Gov't Bonds Antitrust Litig. ("MGB"), 412 F. Supp. 3d 380, 388 (S.D.N.Y. 2019). To state a claim post-Twombly, a complaint must provide a basis to infer "the culpability of the specific defendants named in the complaint." Id. "[C]laims as to the motivations or actions of [the defendants] as a general collective bloc, or generalized claims of parallel conduct, must also be

set aside . . . as impermissible group pleading." In re Int. Rate Swaps Antitrust Litig., No. 16-mc-2704, 2018 WL 2332069, at *15 (S.D.N.Y. May 23, 2018).

**II.**

The Amended Complaint repeats the bulk of the allegations contained in the original complaint, described at length in Okla. Firefighters I, with which the Court assumes familiarity. Unless otherwise noted, the following allegations are taken from the Amended Complaint and are accepted as true for purposes of deciding the current motion.

**A.**

Gilts are sovereign debt securities issued by the United Kingdom government. Am. Compl. ¶ 2. The United Kingdom Debt Management Office ("DMO") oversees the issuance of Gilts in the primary market. Id. ¶ 92. There are two types of Gilts: conventional Gilts and index-linked Gilts. Id. ¶ 93. Conventional Gilts pay the holder a fixed cash payment—a coupon—every six months until maturity, at which point the holder receives the final coupon and the principal. Id. Index-linked Gilts differ in that their coupons and principal are adjusted to account for accrued inflation from the issue date. Id. During the relevant period, conventional Gilts comprised approximately seventy-five percent of Gilts in issue. Id.

Gilts mature over periods ranging from several months to fifty years, and, by 2014, seventy-two issued Gilts had yet to reach maturity. Id. ¶ 94. Those Gilts had a total outstanding value of nearly £1.5 trillion, approximately

thirty percent of which was held by investors residing outside the United Kingdom. Id.

Gilt dealers operate in two markets. In the primary market, the United Kingdom government issues Gilts at auction. Id. ¶ 3. For conventional Gilts, the United Kingdom government conducts a multiple-price auction, in which bidders specify the quantity of bonds they wish to purchase and the prices they are willing to pay. Id. ¶ 101. The DMO then determines the cutoff yield or price and accepts bids above the cutoff. Id. For index-linked Gilts, the DMO conducts a single-price auction. Id. ¶ 102.

To ensure active participation in primary-market auctions, the DMO selects a limited number of banks to serve as Gilt-edged Market Makers, or "GEMMs." Id. ¶ 20. As of 2013, sixteen banks operated as GEMMs, including banks from each of the five banking groups named as defendants in this action.[1] Id. Once selected, GEMMs are obligated to play an active role in the issuance, distribution, and marketing of Gilts. Id. ¶ 105. Specifically, the DMO expects each GEMM to purchase—and requires each GEMM to bid on—at least two percent of both conventional Gilts and index-linked Gilts on a six-month rolling-average basis. Id. In advance of each issuance auction, the DMO also designates certain GEMMs as market makers that are required to participate. Id. These obligations help ensure that the DMO sells all the Gilts offered at each auction. Id. In return for undertaking these obligations, GEMMs receive

[1] In the original complaint, the plaintiffs alleged that twenty-one banks operated as GEMMs. See Compl. ¶ 16.

certain privileges, including a non-competitive allowance equal to fifteen percent of the total amount of bonds offered at Gilt auctions. Id. ¶ 106.

The DMO monitors and ranks the performance of GEMMs in primary-market auctions. Id. ¶ 109. To achieve a higher ranking, GEMMs must bid for larger quantities of auctioned bonds at higher prices. Id. The DMO rewards higher-ranked GEMMs with financial incentives, including opportunities to participate in more lucrative transactions. Id. ¶ 110.

After Gilts are issued in the primary market, bond dealers and investors trade Gilts in the secondary market. Id. ¶ 113. Participants in the secondary market include various funds, banks, companies, and state and local governments. Id. Trades for Gilts occur over the counter ("OTC"), meaning that customers seeking to buy or sell must contact one or more banks directly and request pricing. Id. ¶¶ 113, 116.

The difference between the quoted price at which a dealer will buy a given Gilt outside an auction (the "bid" price) and the quoted price at which it will sell the same Gilt (the "ask" price) is called the bid-ask spread. Id. ¶ 116. Dealers can earn profits by collecting the difference between the bid and ask prices. Id.

The secondary market always stays liquid because the DMO expects GEMMs to buy and sell, on demand, all Gilts for which they have been recognized as a primary dealer. Id. ¶ 115. In addition, the DMO expects each GEMM to maintain a minimum individual market share of Gilts available to trade on the secondary market. Id.

In a free-flowing market, Gilt dealers compete for customers based on their bid-ask spreads. Id. ¶ 119. Banks that narrow their spreads—in other words, lower profit margins—have more competitive prices and gain customers and business. Id. Conversely, banks that widen their spreads can earn higher profit margins but risk losing their customers to rivals that offer narrower spreads. See id.

Gilt futures are standardized contracts for the future delivery of Gilts. Id. ¶ 5. They reflect a commitment either to make delivery of Gilts, in the case of a short contract, or to take delivery of Gilts, in the case of a long contract, at a defined point in the future. Id. ¶ 121. Gilt options are also contracts tied to the future delivery of Gilts, but, unlike futures, they give the holder the right, rather than the obligation, to make or take delivery of Gilts. See id. ¶ 122. The prices of futures or options related to Gilts are based on the price of the underlying Gilts. Id. ¶¶ 122–23. During the Class Period, futures and options related to Gilts were traded on the New York Stock Exchange's London International Financial Futures and Options Exchange ("NYSE LIFFE"). Id. ¶ 124.

**B.**

According to the plaintiffs, the defendants acted as each corresponding banking group's primary dealer for Gilts during the Class Period through dealers stationed in London, United Kingdom. Id. ¶¶ 136–37. The defendants acquired Gilts in the primary market and priced trades in the secondary market, distributing Gilts as needed to fill customer orders through their sales and trading networks. Id. ¶ 137.

Globally, sales personnel in financial trading hubs, such as New York City, interacted with investors, managed client relationships, and administered customer orders. Id. Each United States affiliate of the defendants served as the American trading hub for its respective banking group during the Class Period. Id. However, foreign defendants, including DBAG, sometimes transacted directly with United States customers and, at other times, transacted with United States customers through their United States affiliates, including DBSI. Id. ¶ 139.

The plaintiffs allege that the defendants formed a horizontal conspiracy artificially to widen the bid-ask spreads for Gilts in the secondary market in the United States. Id. ¶¶ 1, 4–6, 150. According to the plaintiffs, the defendants' traders first manipulated the prices and allocations of Gilts in the primary market. Id. ¶¶ 150, 157. The defendants then raised their ask prices and lowered their bid prices in the secondary market, acting in concert to extract additional profits from their customers. Id. ¶¶ 4, 108, 152.

The defendants allegedly carried out this conspiracy in a scheme coordinated by DBAG by exchanging highly sensitive information over private chatrooms: allocations in the primary market, bidding and trading strategies, customer-order information, their real-time bid and ask prices, and executed-trade prices. Id. ¶¶ 6–7, 150, 151, 157. Traders from the other four banks would share confidential pricing and strategic information with the DBAG trader, who would then disseminate the information in one-to-one chatrooms back to the several informants. Id. ¶ 157.

The plaintiffs offer four main categories of allegations in support of their conspiracy claims: (1) numerous chatroom transcripts, (2) the results of a United Kingdom regulatory investigation, (3) statistical analyses, and (4) circumstantial allegations concerning the structure of the Gilts market.

**1.**

In the Amended Complaint, the plaintiffs cite more than eighty pages of chatroom transcripts among traders for the defendants. See id. ¶¶ 163–303. Those transcripts include numerous communications allegedly reflecting express agreements among traders to trade at particular prices at particular times, in either the primary or secondary market, and, in some instances, to trade with one another for the purpose of maintaining prices. See, e.g., id. ¶¶ 164, 168, 170, 172, 193–94, 196–98, 201–03, 205–09, 211, 216, 218, 226–27, 284, 300. Several examples are illustrative.

On January 7, 2010, DBAG and HSBC traders allegedly agreed to inflate artificially, or "pump up," the offer price of Gilts maturing in 2014. Id. ¶ 197. They also anticipated that there would be no investor interference with that effort. Id. The Amended Complaint quotes DBAG Trader 1 as stating:

| | |
|---|---|
| **DBAG Trader 1**: | I reckn we just lock it in and then we an always pump up the 14s into the pricing time anyways / not like investor will be selling the underlyin / g / well i would be very surprised |

Id.[2]

Again, on January 11, 2010, DBAG and HSBC traders allegedly agreed to "pump" the prices of Gilts:

| | |
|---|---|
| **DBAG Trader 1**: | I reckon we'll be able to pump these 5 14 up into it anyways |
| **HSBC Trader 1:** | pump 'em up! |

Id. ¶ 201.

On February 22, 2010, DBAG and RBC traders allegedly coordinated their trading strategy ahead of the United Kingdom government's spring budget announcement, including by allocating Gilts among themselves without bidding for them:

| | |
|---|---|
| **DBAG Trader 1:** | so going into the budget i want to be short |
| **RBC Trader 1**: | yes agreed |
| **DBAG Trade 1**: | not massively though |
| **RBC Trader 1**: | bunds a slot between 80 and 00 / 25 stop |
| **DBAG Trader 1**: | more short auctions mean more money for me and you |
| **RBC Trader 1**: | hahaha yes |
| **DBAG Trader 1**: | so maybe we should be long |

[2] Unless otherwise noted, this Memorandum Opinion and Order omits all alterations, omissions, emphasis, quotation marks, and citations in quoted text.

| | |
|---|---|
| **RBC Trader 1:** | imgnie how much funa new issue wil be now |
| **DBAG Trader 1:** | new match 2016 / slot 4 16 / slot 4t15 |
| **RBC Trader 1:** | yum yum / slot the bond / keep slotting it / untilt the 3rd aucxtion |
| **DBAG Trader 1:** | haha. . . and then dont bid |
| **RBC Trader 1:** | yum yum |

Id. ¶ 214.

On April 14, 2010, DBAG and RBC traders allegedly coordinated their respective balance sheets and trading capacity and expressly agreed to "build the brick wall" at a specific price point in order to reduce the yield spread—that is, the price difference—between Gilts maturing in 2014 and Gilts maturing in 2015:

| | |
|---|---|
| **DBAG Trade 1**: | that 14-15s looks too steep / if i didn't have flatteners on already i would do more |
| **RBC Trader 1**: | same mate |
| **DBAG Trader 1**: | i reckon when we get close to 14s auction 14/15s will move back to 35 |
| **RBC Trader 1**: | it will after |
| **DBAG Trader 1**: | trading 42.5 / 14/15s / sheer panic |
| **RBC Trader 1:** | whaaaaaaaaaaaaaaat |
| **DBAG Trader 1:** | yes / i had 41.5 mid |
| **RBC Trader 1:** | i'm pu |

| | |
|---|---|
| **DBAG Trader 1:** | i'm selling there too / flt in 2q14 now |
| **RBC Trader 1:** | same / crazy / levels |
| **DBAG Trader 1:** | 43 is so wrong its stupid |
| **RBC Trader 1:** | i know |
| . . . | |
| **DBAG Trader 1:** | you trading 42.75 |
| **RBC Trader 1:** | yes |
| **DBAG Trader 1:** | you lemon |
| . . . | |
| **DBAG Trader 1** | we'll ust build the brick wall at 43 |
| **RBC Trader 1:** | yes agreed |
| **DBAG Trader 1:** | will be below 38 at auction time |

Id. ¶ 249.

On June 17, 2010, DBAG and RBC traders allegedly discussed a strategy to "slam" Gilts maturing in 2014. Id. ¶ 258. According to the Amended Complaint, the traders planned to post inflated ask prices and, if the market did not accept those prices, to hit bid prices aggressively in order to force the bid price down to maintain the yield spread. Id. The Amended Complaint quotes the following exchange:

| | |
|---|---|
| **DBAG Trader 1**: | no one lifted me in 5 14 / hahahhahahaha |
| **RBC Trader 1:** | hahahahha / make take it out |

| | |
|---|---|
| **DBAG Trader 1:** | let them get long |
| **RBC Trader 1**: | we want people to take otion / yes |
| **DBAG Trade 1**: | ok |
| **RBC Trader 1**: | if they're 03 middle and don't get taken then we lam the market |
| **DBAG Trader 1**: | they would take them up whatever |
| **RBC Trader 1**: | if they do get taken then we slam the market / slam slam slam / bye bye shorts / hahahah |
| **DBAG Trader 1**: | haha / hitting 112 / haha / he bought 25m / just testing / there might still be some nibbly buyers about |

Id. ¶ 259.

On March 1, 2012, traders from DBAG and RBC allegedly agreed to inflate the price of Gilts maturing in 2019 from 68.25 to above 70:

| | |
|---|---|
| **DBAG Trader 1**: | how many do we have to buy to get them back abive 70 |
| **RBC Trader 1**: | hahahah / 150 |

Id. ¶ 284.

On October 30, 2012, DBAG and Citigroup traders allegedly exchanged information about a real-money account ("rm acc") that was buying Gilts maturing in 2044 and selling Gilts maturing in 2042 and 2055. Id. ¶ 300. Based on that information, the traders allegedly agreed that both banks would quote a "high" ask price:

| | |
|---|---|
| **CITI Trader 1**: | hearing a large rm acc looking to buy 44 v 42s and 55 mate |
| **DBAG Trader 1:** | doesnt surprise me / 44s are fine here / especially once the street sells out its logns in 10 mins |
| **CITI Trader 1:** | yup i'm offering mine high / u reckon my 101.69 gets lifted / ? |
| **DBAG Trader 1:** | not a million miales away / i put 101.57 and up |

Id.

Many of the chats also involve the exchange of confidential information concerning the traders' own positions or their clients' positions. See, e.g., id. ¶¶ 168–70, 174, 176–78, 195, 210, 212–13, 215, 217–19, 222, 225–26. According to the plaintiffs, most of these communications involved DBAG traders, who led discussions with traders from other defendants concerning Gilt prices, real-time trading strategies, and market predictions. See, e.g., id. ¶¶ 169–71, 173–75, 177, 180, 182, 194, 196, 210–16, 218, 224, 226.

**2.**

The plaintiffs also point to a regulatory investigation in the United Kingdom. On May 24, 2023, the United Kingdom Competition and Markets Authority (the "CMA"), the United Kingdom's principal antitrust regulator, announced that it had issued a Statement of Objections to DBAG and four of the other defendants following a five-year investigation that began in November 2018. Id. ¶ 304. The CMA also announced its "provisional decision that . . . [the five] global banks broke competition law by taking part in a series of one-

to-one online exchanges of competitively sensitive information on pricing and other aspects of their trading strategies on UK bonds." Id. ¶ 307.

The accompanying press release specified that these information exchanges "took place in one-to-one Bloomberg chatrooms between a small number of traders who worked at the banks" and included "details on pricing and other aspects of their trading strategies." Id. ¶ 305. The press release further stated that, "[b]y unlawfully exchanging competitively sensitive information rather than fully competing, the banks involved in these arrangements could have denied the full benefits of competition to those they traded with—including among others, pension funds." Id. ¶ 306.

Not all defendants may face substantial fines from the CMA. As alleged, the CMA granted DBAG provisional immunity under its leniency program after DBAG proactively alerted the CMA to its participation in the information-sharing scheme. Id. ¶¶ 316–21. Citigroup later applied for leniency and received a discount on any future fines, conditioned on its continued cooperation. Id. ¶ 323. Citigroup also reached a settlement with the CMA, entitling it to an additional, separate discount on any future fines. Id. These developments are significant because, according to the plaintiffs, the CMA grants leniency to antitrust cooperators only when the immunity recipient or settling party admits its participation in, and submits evidence of, a cartel in violation of United Kingdom competition law. Id. ¶ 324.

On February 21, 2025, the CMA concluded its investigation, resulting in five separate infringement decisions and more than £100 million in fines

against the defendants. Id. ¶ 325. Like the Amended Complaint here, the CMA's decisions relied on 76 days of bilateral interbank communications among the defendants, 96% of which allegedly involved DBAG. Id. ¶ 328. The CMA found:

> All banks were involved in unlawful exchanges relating to trading. In addition, Citi, Deutsche Bank, HSBC and Morgan Stanley were involved in unlawful exchanges relating to auctions; and Deutsche Bank, Citi and Morgan Stanley were involved in unlawful exchanges relating to buy-back auctions. Deutsche Bank and RBC also coordinated their strategies for trading gilts via brokers on a limited number of occasions.

Id. ¶ 329.

The plaintiffs further allege that certain defendants have been fined, sanctioned, pleaded guilty to, or are under investigation for various other antitrust violations. Id. ¶¶ 403–434.

**3.**

In the Amended Complaint, the plaintiffs add statistical analyses based on price-quote data available from 2006 through 2016, including pricing information from DBAG, RBC, and Morgan Stanley. Id. ¶¶ 332–33. The plaintiffs allege that they tested the effect of the defendants' alleged price-fixing scheme using both a difference-in-differences regression methodology and a dummy-variable regression methodology. Id. ¶ 337. The difference-in-differences analysis allegedly shows that DBAG's bid-ask spreads during the Class Period were 15.1% wider than they would have been absent the conspiracy, a difference that the plaintiffs allege cannot be explained by non-conspiratorial factors. Id.

¶ 341. The dummy-variable regression analysis similarly allegedly shows that DBAG's spreads were 10.6% wider during the Class Period. Id. ¶ 344.

**4.**

The plaintiffs also offer circumstantial allegations concerning the structure of the Gilt market that made it susceptible to market manipulation. They allege that prospective dealers face high barriers to entry, id. ¶¶ 376–77; that the limited liquidity of Gilts makes the market susceptible to dislocation and sharp price movements, id. ¶¶ 379, 381; that customers make large, infrequent transactions at regular intervals, id. ¶¶ 380, 382; and that customers rely on quotes from individual dealers, id. ¶¶ 384–85.

The plaintiffs further allege that the defendants' Gilt traders were closely connected through lateral employment moves, repeated dealings, and DMO-sanctioned conferences. Id. ¶¶ 389–99. The Amended Complaint includes chats showing that the defendants' traders met socially after work and had regular conferences related to Gilts. Id. The plaintiffs also allege that the defendants' traders maintained a high level of direct interfirm communications, which the defendants failed to monitor despite having the ability to do so. Id. ¶¶ 400–01. Finally, the plaintiffs allege that the defendants collectively comprised approximately one-third of all banks designated as GEMMs. Id. ¶ 402.

The plaintiffs further allege that the defendants acted contrary to their individual economic interests. Id. ¶¶ 387–88. By widening their spreads, the

banks risked losing customers and jeopardizing their GEMM status. Id. And by sharing proprietary information, the banks allegedly did so knowing that their rivals could profit from the anticipated trades to the sharing bank's detriment. Id.

**C.**

As a result of the defendant's alleged price-fixing conspiracy, the plaintiffs allege that they were harmed by artificially set Gilt prices. Oklahoma Firefighters alleges that it entered into Gilt transactions with HSBC and Citigroup during the five-year Class Period. Id. ¶ 33. Specifically, Oklahoma Firefighters alleges that it paid inflated prices in at least twenty-three Gilt transactions with HSBC, dated from September 21, 2009, to February 25, 2013, for a total amount exceeding $50 million, and in one Gilt transaction with Citigroup on November 8, 2010, for approximately $2.8 million. Id. ¶ 34. Oklahoma Firefighters also alleges that it sold Gilts at artificially suppressed prices in at least fifteen transactions with HSBC, dated from December 2, 2009, to February 25, 2013, for a total amount exceeding $40 million, and in one transaction with Citigroup on November 11, 2010, for approximately $2.2 million. Id. ¶ 35.

Ohio Carpenters alleges that it entered into Gilt transactions with HSBC and DBAG during the Class Period. Id. ¶¶ 36–37. Specifically, on March 11, 2009, Ohio Carpenters allegedly purchased one million shares of Gilts from HSBC at an inflated price of $1,430,206.65. Id. ¶ 37. On October 7, 2011, Ohio Carpenters allegedly purchased 200,000 shares of Gilts from DBAG at an

inflated price of $361,923.89. Id. On January 31, 2012, Ohio Carpenters allegedly sold 200,000 shares of Gilts to DBAG at an artificially suppressed price of $389,330.48. Id. ¶ 38.

Hehmeyer alleges that it lost money by purchasing or selling 1,911 Gilt futures with unspecified defendants between 2008 and 2013, without identifying the value of those transactions. Id. ¶¶ 39–40.

The plaintiffs purport to represent a class of all persons or entities who purchased or sold Gilts or futures or options related to Gilts on the LIFFE in the United States directly from the defendants during the Class Period. Id. ¶ 435. The plaintiffs except from the putative class the defendants, their employees, affiliates, parents, subsidiaries, and co-conspirators, as well as the United States Government. Id.

## III.

### A.

As an initial matter, DBSI argues that the claims against it must be dismissed because the Amended Complaint does not allege that DBSI itself participated directly in fixing the prices of Gilts, apart from DBAG's alleged conduct. Defs.' Mem. Supp. Defs.' Mot. to Dismiss ("Defs.' Mem.") 4–5, ECF No. 168.

That argument is unpersuasive at this stage. The plaintiffs need not allege that a DBSI trader personally participated in the price-fixing chats if the Amended Complaint otherwise plausibly alleges that DBSI participated in the challenged domestic transactions. The Amended Complaint alleges that DBSI

served as DBAG's United States distributor for Gilts during the Class Period. Am. Compl. ¶ 49. The alleged transaction structure was straightforward: when a DBSI salesperson received an order from a United States customer to buy or sell a Gilt, the salesperson requested a quote from DBAG. Id. ¶ 23. DBAG then supplied the price at which the transaction would be executed, and DBSI communicated that price to the customer and facilitated the transaction. Id. Thus, the Amended Complaint plausibly alleges that DBSI was the entity through which DBAG's allegedly manipulated Gilt prices were transmitted to United States customers.

The Amended Complaint also cites chats in which DBAG traders discussed Gilt trades involving the United States market. See, e.g., id. ¶¶ 271, 289–90. Those allegations further support the inference that DBSI, as DBAG's United States distributor, facilitated domestic transactions affected by DBAG's alleged conduct. For example, on March 9, 2011, DBAG and Morgan Stanley traders allegedly shared information concerning a regular United States client and coordinated their positions for the ensuing trades:

| | |
|---|---|
| **MS Trader 1** | 5y certainly under pressure these days, u seeing much? / just making sure i'm not about ot blow my top |
| **DBAG Trader 1** | Not seeign anything / usual seller y'day / saw him / but thats it |
| **MS Trader 1**: | yeah i mean we saw one US big account selling / oh yes, you told me about this / i'm an idiot / can't be i forgot |

| | |
|---|---|
| **DBAG Trader 1:** | i sold us 100m |
| **MS Trader 1:** | Yeah about the same here, in the area, not specifically to that secutiry / security |

Id. ¶ 271.

Accordingly, at the pleading stage, and drawing all reasonable inferences in favor of the plaintiffs, these allegations are sufficient to connect DBSI to the alleged domestic transactions affected by the conspiracy. See In re Eur. Gov't Bonds Antitrust Litig. ("EGB"), No. 19-cv-2601, 2020 WL 4273811, at *19 (S.D.N.Y. July 23, 2020) (holding that allegations of an agency relationship between two defendants, including allegations that they worked closely together in the secondary market, supported a reasonable inference that both defendants were involved in the alleged anticompetitive conduct).

**B.**

In their motion to dismiss, DBAG and DBSI argue that the plaintiffs fail to allege a plausible antitrust conspiracy involving DBAG. Defs.' Mem. 5–12. DBAG and DBSI argue that: (1) the alleged conspiracy is facially implausible because it makes no economic sense; (2) the plaintiffs fail to allege direct evidence of a conspiracy; and (3) the plaintiffs fail to plead circumstantial evidence of parallel pricing or plus factors suggesting that any parallel conduct resulted from the alleged conspiracy. Id.

**1.**

As a threshold matter, DBAG and DBSI argue that the plaintiffs' theory of a conspiracy to fix Gilt prices throughout the Class Period is implausible

because the defendants allegedly represented only a small subset of all secondary-market dealers and lacked pricing power. Id. at 5–6.

In Socony-Vacuum Oil Co., the Supreme Court explained that:

> Any combination which tampers with price structures is engaged in an unlawful activity. Even though the members of the price-fixing group were in no position to control the market, to the extent that they raised, lowered, or stabilized prices they would be directly interfering with the free play of market forces.

310 U.S. at 221.

In this case, the plaintiffs have alleged sufficient facts to support a plausible inference that a horizontal agreement between multiple banks to fix Gilt prices existed. Unlike the original complaint, the Amended Complaint alleges direct evidence of coordination among traders at competing banks. Read in the light most favorable to the plaintiffs, the alleged chats contain the type of "smoking gun" evidence the Court found absent in Okla. Firefighters I: namely, communications in which traders allegedly agreed to "pump up," "slam," or "build the brick wall" over the prices of specific Gilts, coordinated the timing and direction of trades, and allocated positions in connection with primary-market auctions. See Am. Compl. ¶¶ 163–303.

Those allegations are sufficient at the pleading stage. Under Socony-Vacuum, these agreements to fix Gilt prices or allocate Gilt shares are unlawful even if the conspirators lacked market-wide control. 310 U.S. at 221; see also Gelboim v. Bank of Am. Corp., 823 F.3d 759, 775 (2d Cir. 2016) ("[A]llegations pleading harm to competition are not required to withstand a motion to dismiss

when the conduct challenged is a per se violation."). Because the Amended Complaint plausibly alleges that DBAG traders participated in precisely that kind of price coordination with traders at other defendant banks, DBAG and DBSI's argument that the alleged conspiracy is implausible because the defendants lacked sufficient market power lacks merit.

**2.**

DBAG and DBSI argue that the plaintiffs' alleged direct evidence does not establish an unlawful agreement or conspiracy. Defs.' Mem. 6–7. First, DBAG and DBSI contend that interpreting phrases such as "pump 'em up" and "slam the market" as evidence that traders agreed to manipulate prices requires an unwarranted "inferential leap." Id. at 7.

However, the alleged chats must be read in context, with all reasonable inferences drawn in favor of the plaintiffs. So read, phrases such as "pump 'em up" and "slam the market" plausibly refer to efforts to move Gilt prices in a coordinated way.

For example, in the January 7, 2010 exchange between DBAG and HSBC traders, the DBAG trader allegedly proposed to "lock" the price and then "pump up" the prices of Gilts maturing in 2014 during "the pricing time." Am. Compl. ¶ 197. That language plausibly suggests more than ordinary market commentary. A proposal to "pump up" a specific Gilt during a specific pricing window reasonably supports the inference that the trader was discussing an effort to increase the price of that Gilt.

The surrounding language reinforces that inference. In the same message, the DBAG trader allegedly stated that the investor would not be "selling the underlyin[g]" security. Id. That statement, in context, aligns with the plaintiffs' allegations because investor sales of the underlying Gilts could have created downward pressure on the price and interfered with the alleged effort to "pump up" the price during the pricing window.

Similarly, the context surrounding the other challenged phrases supports the same inference. For example, the alleged reference to "slamming the market" was not made in isolation. The traders allegedly discussed whether a particular price level—"03 middle"—would be accepted and then stated that, if it was not, they would "slam the market." Id. ¶ 259. Read in context, that exchange plausibly suggests that the traders were discussing how to move the market price in response to a specific pricing condition, rather than merely using loose trading jargon.

Thus, the Amended Complaint does not rely on isolated slang divorced from context. It alleges communications in which traders discussed specific securities, specific timing, specific price points, and expected investor behavior in a way that plausibly supports an inference of coordinated price manipulation.

Moreover, the Amended Complaint does not rely solely on the phrases, such as "pump 'em up" and "slam the market." It contains numerous other chatroom transcripts that plausibly suggest express agreements to manipulate Gilt prices. Those allegations include, for example, an alleged agreement to

allocate portions of a primary auction, see id. ¶ 214; an alleged agreement to continue buying until the price of a Gilt rose above a specified level, see id. ¶ 284; and an alleged agreement to quote a high ask price after traders exchanged confidential information about a client's trading position, see id. ¶ 300. Taken together, these allegations plausibly support an inference that the traders were coordinating prices, trading strategy, and allocation decisions in a manner that unreasonably restrained competition.

Second, DBAG and DBSI argue that the cited chats do not support the scope of the alleged conspiracy because most of the chats fall within two discrete periods: a six-month period in 2010 and a five-month period in 2012. See Defs.' Mem. 7–8.

However, in In re GSE Bonds Antitrust Litigation ("GSE Bonds"), the court sustained a complaint that relied on "four chats, representing conversations about four bonds during a period when tens of thousands were traded." 396 F. Supp. 3d 354, 361 (S.D.N.Y. 2019). The court explained that, at the pleading stage, the plaintiffs were "not expected to marshal evidence . . . of every single time defendants unlawfully conspired," and that the "tone" of the alleged conversations suggested that the chats "were not isolated" incidents. Id. After all, direct evidence of an antitrust conspiracy may be "a recorded phone call in which two competitors agreed to fix prices at a certain level." Mayor & City Council of Balt., 709 F.3d at 136; see also In re Foreign Exchange Benchmark Rates Antitrust Litig. ("FX"), 74 F. Supp. 3d 581, 591–92 (S.D.N.Y. 2015).

In this case, the allegations are substantially more extensive. The plaintiffs cite more than eighty pages of chatroom transcripts spanning eleven months and allegedly reflecting repeated coordination among traders at competing banks. The content and tone of those chats support the plausible inference that the alleged coordination was not isolated. The traders allegedly exchanged confidential information, discussed their positions and strategies, and coordinated specific trading conduct with apparent familiarity with each other. Compared with the four chats found sufficient in GSE Bonds, these allegations are more than sufficient at the pleading stage to support a plausible inference that the cited chats were examples of a broader conspiracy rather than isolated incidents.

Third, DBAG and DBSI argue that the cited chats do not identify any trade with a United States counterparty. Defs.' Mem. 7–8. But that is inaccurate. The Amended Complaint alleges that, on March 9, 2011, DBAG and Morgan Stanley traders discussed a "US big account selling" Gilts, and that the DBAG trader stated that he had sold that account "100m." Am. Compl. ¶ 271. The Amended Complaint also cites chats referring to "west coast" trading activity. Id. ¶ 296.

Read together with the broader allegations that approximately fourteen percent of outstanding Gilts were held by United States residents, see id. ¶ 144, the alleged chats plausibly support an inference that at least some of the alleged coordinated trading activity involved United States counterparties or United States-based trading activity.

**3.**

DBAG and DBSI also argue that the Amended Complaint fails to allege circumstantial evidence of a conspiracy, including parallel conduct and plus factors. Defs.' Mem. 8–12.

That argument does not provide a basis for dismissal. Where a complaint plausibly alleges direct evidence of an agreement, it is unnecessary to determine whether the complaint also pleads parallel conduct and plus factors. See MGB, 2025 WL 104099, at *7 n.16 ("Because the Court has found evidence of direct agreements, it need not determine the existence of parallel conduct or adequate 'plus factors.'"); see also Mayor & City Council of Balt., 709 F.3d at 136. In this case, the plaintiffs have plausibly alleged direct evidence of chats showing express agreements among traders for the defendants to manipulate Gilt prices.

In any event, the Amended Complaint has remedied the most fatal deficiencies identified in Okla. Firefighters I. Unlike the original complaint, which "does not identify any specific quote by any defendant to any customer, nor does it plead that any two defendants ever coordinated prices on Gilts traded in the United States," 2024 WL 4202680, at *7, the Amended Complaint is replete with chats that allegedly discuss client positions, see, e.g., Am. Compl. ¶¶ 168, 178, 182, 195, 203, 210, 212, 215, 219, 222–23, and other chats in which traders allegedly coordinated Gilt prices. Those allegations directly address the prior issue that the complaint failed to identify concrete communications connecting particular defendants to coordinated pricing conduct.

Additionally, unlike the "barebones group pleading of parallel conduct" in Okla. Firefighters I, 2024 WL 4202680, at *7, the allegations in the Amended Complaint are specific to each defendant. The chats identify the defendant bank for which each speaker worked and the specific Gilts and prices that the traders allegedly manipulated. See Am. Compl. ¶¶ 163–303. The Amended Complaint also identifies specific transactions between the plaintiffs and particular defendants, in which the plaintiffs were allegedly harmed by artificial prices. See id. ¶¶ 34–35, 37–38, 40. The Amended Complaint, therefore, more than "articulate[s] a link between the allegations and the specific defendants named in the complaint." Okla. Firefighters I, 2024 WL 4202680, at *7 (citing MGB, 412 F. Supp. 3d at 389).

**C.**

DBAG and DBSI next contend that the plaintiffs lack antitrust standing because: (1) the Amended Complaint fails to plead antitrust injury; and (2) Hehmeyer is not an efficient enforcer. Defs.' Mem. 13–17.

"An antitrust plaintiff must show . . . antitrust standing at the pleading stage." In re Aluminum Warehousing Antitrust Litig., 833 F.3d 151, 157 (2d Cir. 2016). To meet the antitrust standing requirement, the plaintiff must allege plausibly (1) that it suffered an antitrust injury, and (2) that it is an "efficient enforcer[ ] of the antitrust laws." Id. "In determining antitrust standing, [courts] assume the existence of an antitrust violation." Harry v. Total Gas & Power N. Am., Inc., 889 F.3d 104, 115 (2d Cir. 2018).

**1.**

DBAG and DBSI argue that Oklahoma Firefighters and Ohio Carpenters fail to plead sufficient details about their specific transactions with the defendants. Defs.' Mem. 13–14. In particular, DBAG and DBSI contend that the Amended Complaint does not allege that any of their transactions was "the subject of, or plausibly affected by, any alleged chat," or that the transactions occurred at the same time as any alleged price-fixing communications. Id.

As this Court already held in Okla. Firefighters I, the original complaint satisfied the "low threshold" required to plead an injury in fact under Article III. 2024 WL 4202680, at *11. The same is true for the Amended Complaint.

The plaintiffs also plausibly allege antitrust injury. They allege a per se unlawful horizontal price-fixing conspiracy that caused them to buy Gilts at artificially inflated prices and sell Gilts at artificially suppressed prices. Am. Compl. ¶¶ 34, 35. That is the type of injury the antitrust laws are designed to prevent. See Gelboim, 823 F.3d at 773–74.

Moreover, the Amended Complaint remedies the deficiency identified in Okla. Firefighters I. Unlike the original complaint, which did "not point to any transaction in which the plaintiff paid too much or received too little when it bought or sold a Gilt with any of the defendants," 2024 WL 4202680, at *11, the Amended Complaint identifies specific transactions, including the dates, amounts, and the defendants involved. Compare Compl. ¶¶ 28, 116, with Am. Compl. ¶¶ 34–35, 37–38.

DBAG and DBSI argue that the plaintiffs must go further and identify which particular chat affected which particular transaction. Defs.' Mem. 13–14. But that level of transaction-by-transaction causation is not required at the pleading stage. The plaintiffs allege that they traded in "the very market that the defendants restrained." Eastman Kodak Co. v. Henry Bath LLC, 936 F.3d 86, 95 (2d Cir. 2019); see also EGB, 2020 WL 4273811, at *13 (rejecting the argument that the plaintiffs are required to plead the specific transactions affected by the alleged anticompetitive conduct). Where, as in this case, the plaintiffs allege that they bought or sold the price-fixed instrument in the restrained market during the Class Period, and that the conspiracy distorted prices in that market, the plaintiffs have plausibly alleged that their injuries flowed from the defendants' alleged anticompetitive conduct. See Gelboim, 823 F.3d at 772 ("Generally, when consumers, because of a conspiracy, must pay prices that no longer reflect ordinary market conditions, they suffer injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful.").

**2.**

DBAG and DBSI also argue that Hehmeyer fails to plead sufficient details about its alleged loss to establish antitrust injury. Defs.' Mem. 14–17. That argument is also unpersuasive at this stage. As the Court acknowledged in Okla. Firefighters I, where "the plaintiffs plausibly alleged a pervasive conspiracy that infected the pertinent markets for the entirety of the alleged

conspiracy periods," courts have found "general allegations that the plaintiffs directly transacted in the manipulated market at some point during the conspiracy period" sufficient to plead antitrust injury at the motion-to-dismiss stage. 2024 WL 4202680, at *12 (citing FX, 74 F. Supp. 3d at 587, 595–98; GSE Bonds, 396 F. Supp. 3d at 366–67).

In this case, as explained above, the Amended Complaint plausibly alleges a scheme to manipulate Gilt prices during the Class Period. Hehmeyer alleges that it bought and sold 1,911 Gilt futures during the same period and incurred losses as a result of the alleged price manipulation. Am. Compl. ¶¶ 39–40. At the pleading stage, those allegations are sufficient to plead antitrust injury.

To the extent DBAG and DBSI argue that Hehmeyer is not an efficient enforcer because its injury from Gilts futures, as a derivative product of the bonds, is too "far down the chain from [the] defendants' actions," Defs.' Mem. 17, that argument has no merit. The Court of Appeals for the Second Circuit has recognized that injuries suffered by futures traders may be sufficiently direct for purposes of antitrust standing. In In re Platinum & Palladium Antitrust Litig. ("Platinum"), the Court of Appeals rejected the argument that exchange-traded futures plaintiffs were not directly injured merely because their trades cleared through a clearinghouse, explaining that "[f]utures trading is a zero-sum game because every contract has a long and a short," and therefore "every gain can be matched with a corresponding loss." 61 F.4th 242, 263 (2d Cir. 2023). The same is true in this case. Hehmeyer alleges that it traded

Gilt futures and options whose prices derived directly from the prices of the underlying Gilts that the defendants allegedly manipulated. Am. Compl. ¶ 434. Accordingly, the fact that Hehmeyer traded futures and options rather than the underlying Gilts does not render its injury too remote or indirect to support the conclusion that Hehmeyer is an efficient enforcer for purposes of antitrust standing.

**D.**

DBAG and DBSI contend that the plaintiffs' claims are time-barred under the four-year statute of limitations applicable to Sherman Act claims. See 15 U.S.C. § 15b. They argue that the alleged anticompetitive conduct occurred from January 1, 2009, through December 31, 2013, but that Oklahoma Firefighters did not file the original complaint until June 16, 2023, nearly ten years later, and that Ohio Carpenters and Hehmeyer did not join the Amended Complaint until September 3, 2025, more than eleven years after the alleged anticompetitive conduct. Defs.' Mem. 17. Although the Amended Complaint alleges that the statute of limitations was tolled because the defendants' conduct was "inherently self-concealing," DBAG and DBSI argue that those allegations lack the specificity required to plead fraudulent concealment. Id. at 17–18. They also argue that any tolling ended by November 2018 at the latest, when the CMA first announced its investigation, because that announcement placed the plaintiffs on inquiry notice of their claims more than four years before the original complaint was filed. Id. at 18–21.

The statute of limitations is tolled for fraudulent concealment if an antitrust plaintiff establishes "(1) that the defendant concealed from him the existence of his cause of action, (2) that he remained in ignorance of that cause of action until some point within four years of the commencement of his action, and (3) that his continuing ignorance was not attributable to lack of diligence on his part." State of N.Y. v. Hendrickson Bros., Inc., 840 F.2d 1065, 1083 (2d Cir. 1988).

The first element may be satisfied in either of two ways: a plaintiff may allege that the defendants took affirmative steps to prevent discovery of the conspiracy, or that the conspiracy was inherently self-concealing. In re Nine W. Shoes Antitrust Litig., 80 F. Supp. 2d 181, 192 (S.D.N.Y. 2000). Price-fixing conspiracies fall into the latter category because they are, by their nature, secret agreements among competitors not to compete. See In re Issuer Plaintiff Initial Pub. Offering Antitrust Litig. ("IPO"), No. 00-cv-7804, 2004 WL 487222, at *4 (S.D.N.Y. Mar. 12, 2004) ("[P]rice-fixing conspiracies are inherently self-concealing." (citing Hendrickson Bros., 840 F.2d at 1084)).

In this case, as explained above, the plaintiffs plausibly allege a price-fixing conspiracy involving Gilts. Such a conspiracy is inherently self-concealing. See id. The Amended Complaint also alleges affirmative efforts to conceal the scheme. In particular, the plaintiffs cite chatroom transcripts in which traders allegedly instructed one another not to disclose that they had communicated. See Am. Compl. ¶¶ 446–49. For example, traders at DBAG and RBC had the following exchange:

| | |
|---|---|
| **RBC Trader 1**: | dont let peeps know we talk before you tell at him / 8-) |
| **DBAG Trader 1:** | i'm not gonna moan / wont even mention it / same level / 14.5 |

Id. ¶ 448; see also id. ¶¶ 446, 449. Those allegations plausibly support the inference that the defendants sought to keep the alleged coordination secret. Accordingly, the plaintiffs have adequately alleged the first element of fraudulent concealment.

As for the second element, the CMA's November 2018 announcement of its investigation did not, by itself, put the plaintiffs on actual or inquiry notice of the antitrust violation alleged in this case. In Oklahoma Firefighters I, this Court dismissed the original complaint notwithstanding its reliance on the CMA's provisional findings, explaining that "[t]here is no finding that the banks conspired to fix spreads on Gilts sold in the United States." 2024 WL 4202680, at *6. The Court likewise declined to treat other investigations and findings concerning alleged misconduct in other markets as plus factors because "[t]he defendants' alleged wrongdoing in other markets does not constitute evidence that they conspired to fix spreads in the Gilt market." Id. at *10.

Those conclusions are instructive here. The CMA's announcement of an investigation, and even its later provisional findings, did not amount to a determination that the defendants had conspired to fix Gilt spreads. Nor did those materials necessarily disclose the domestic antitrust injury alleged in this case—namely, a conspiracy affecting Gilt transactions in the United

States. A foreign regulatory investigation concerning conduct in the United Kingdom market does not automatically put the plaintiffs on notice that the defendants also engaged in actionable anticompetitive conduct affecting transactions in the United States. Accordingly, contrary to DBAG and DBSI's argument, the CMA's investigation announcement, its subsequent provisional findings, and other foreign investigations do not constitute "uncontroverted evidence clearly demonstrating when the plaintiff should have discovered the challenged conduct." MGB, 2025 WL 104099, at *12.

As for the third element, which DBAG and DBSI do not appear to dispute, the plaintiffs sufficiently allege diligence. The Amended Complaint alleges that the plaintiffs exercised due diligence by monitoring their investments and regularly following financial media. Am. Compl. ¶ 450. Those allegations are sufficient at the pleading stage to support the inference that the plaintiffs' continued ignorance of their claims was not attributable to a lack of diligence. See MGB, 2025 WL 104099, at *13 (same allegation as to the due diligence requirement).

In sum, the plaintiffs plausibly plead that their Sherman Act § 1 claims are subject to equitable tolling under the fraudulent-concealment doctrine.

**E.**

Finally, DBAG argues that the Court lacks personal jurisdiction over it because DBAG is not subject to general or specific jurisdiction in this Court. Defs.' Mem. 21–23.

"Specific jurisdiction exists when a court exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contact with the forum, and general jurisdiction is based on the defendant's general business contacts with the forum state and permits a court to exercise its power in a case where the subject matter of the suit is unrelated to those contacts." Platinum, 61 F.4th at 269.

DBAG is not subject to general personal jurisdiction in New York. DBAG is incorporated in Germany and has its principal place of business in Frankfurt am Main, Germany. Am. Compl. ¶ 41. Accordingly, New York is not a forum in which DBAG is "at home" for purposes of general jurisdiction. See Daimler AG v. Bauman, 571 U.S. 117, 139 (2014).

A court has specific jurisdiction over the defendant when "minimum contacts necessary to support such jurisdiction exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." Licci ex rel. Licci v. Lebanese Canadian Bank, SAL, 732 F.3d 161, 170 (2d Cir. 2013). The Court of Appeals for the Second Circuit has held that due process generally "require[s] that the plaintiff show some sort of causal relationship between a defendant's U.S. contacts and the episode in suit, and the plaintiff's claim must in some way arise from the defendants' purposeful contacts with the forum." Charles Schwab Corp. v. Bank of Am. Corp., 883 F.3d 68, 84 (2d Cir. 2018).

DBAG argues that the plaintiffs cannot establish specific personal jurisdiction by pointing to two alleged transactions with United States investors or

show that the plaintiffs' antitrust claims arise out of those transactions. Defs.' Mem. 21–22.

That argument is unpersuasive. The Amended Complaint alleges that DBAG traders transacted Gilts with a "U.S. real money account" and referred to "west coast" trading activity in devising their trading strategies. Am Compl. ¶¶ 271, 296. Those allegations are examples of contacts that may support specific jurisdiction for claims arising out of the relevant sales. See Charles Schwab, 883 F.3d 68, 82 (2d Cir. 2018) ("Allegations of billions of dollars in transactions . . . easily make out a prima facie showing of personal jurisdiction for claims relating to those transactions."). Although the volume of transactions alleged may not be the same as in Charles Schwab, the principle is the same: where a foreign defendant allegedly enters into transactions with United States counterparties in the market affected by the alleged conspiracy, those contacts may support specific jurisdiction over claims arising from that conduct.

In any event, because the plaintiffs plausibly allege that DBSI served as DBAG's distributor of Gilts in the United States market and facilitated DBAG's Gilt transactions with United States customers, that allegation provides an additional basis for specific jurisdiction.

The Court of Appeals for the Second Circuit has recognized that "an agency relationship between a parent corporation and a subsidiary that sells securities on the parent's behalf could establish personal jurisdiction over the parent in a state in which the parent 'indirectly' sells the securities." Charles

Schwab, 883 F.3d at 85–86; Oklahoma Firefighters Pension & Ret. Sys. v. Banco Santander (Mexico) S.A. Institucion de Banca Multiple ("Santander"), 92 F.4th 450, 458 (2d Cir. 2024). In Santander, the Court of Appeals upheld personal jurisdiction over an out-of-state defendant based on the conduct of its in-state broker-dealer subsidiary, where the out-of-state defendant allegedly supplied trade ideas and priced the trades executed by the in-state subsidiary. Id.

The Amended Complaint alleges a similar agency relationship between DBAG and DBSI as the one in Santander—when DBSI received a United States customer order to buy or sell Gilts, DBSI requested a quote from DBAG; DBAG then supplied the price; and DBSI communicated that price to the United States customer and facilitated the transaction. Am. Compl. ¶¶ 23, 49, 137, 139. Those allegations plausibly support the inference that DBSI acted as DBAG's United States sales channel for Gilt transactions, which warrants the imputation of personal jurisdiction from DBSI, an in-state distributor of Gilts, to DBAG.[3]

## CONCLUSION

The Court has considered all of the parties' arguments. To the extent not addressed specifically, those arguments are either moot or without merit.

[3] Because the plaintiffs have made a prima facie showing of specific personal jurisdiction over DBAG, it is unnecessary to address DBAG's arguments concerning conspiracy jurisdiction.

For the foregoing reasons, the motion to dismiss by DBAG and DBSI is **denied**. The Clerk is respectfully directed to close all pending motions in this case.

**SO ORDERED.**

**Dated:** **New York, New York**
**July 6, 2026**

**John G. Koeltl**
**United States District Judge**